UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

STEPHEN AND LEYLA HILL, AND PAUL
SHAPIRO,

    Plaintiffs,

    v.

HSBC BANK PLC; HSBC HOLDINGS PLC;
HSBC SECURITIES SERVICES
(LUXEMBOURG) S.A.; HSBC
INSTITUTIONAL TRUST SERVICES
(IRELAND) LIMITED; HSBC SECURITIES
SERVICES (IRELAND) LIMITED; HSBC
INSTITUTIONAL TRUST SERVICES
(BERMUDA) LIMITED; HSBC BANK USA,
N.A.; HSBC SECURITIES SERVICES
(BERMUDA) LIMITED; HSBC BANK
(CAYMAN) LIMITED; HSBC PRIVATE
BANKING HOLDINGS (SUISSE) S.A.;
HSBC PRIVATE BANK (SUISSE) S.A.;
HSBC FUND SERVICES (LUXEMBOURG)
S.A.; and HSBC BANK BERMUDA
LIMITED,

    Defendants.

---

No.

CLASS ACTION COMPLAINT

**JURY TRIAL DEMANDED**



010433-11 733527 V1

# TABLE OF CONTENTS

**Page**

I.    NATURE OF THE ACTION ........................................................................1

II.   JURISDICTION AND VENUE ..................................................................8

III.  THE PARTIES............................................................................................11

    A.    The Plaintiffs.........................................................................................11

    B.    The Defendants ......................................................................................11

IV.   THE PONZI SCHEME...............................................................................15

V.    HSBC KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD ...................18

    A.    Madoff's Secrecy ..................................................................................18

    B.    Madoff Insisted on Acting as his Own Custodian ................................19

        1.    The Role of the HSBC Custodian Defendants............................19

        2.    The Delegation of HSBC's Custodial Duties was Illegal..........21

    C.    HSBC as Administrator of Certain HSBC Feeder Funds ......................23

    D.    Negative Cash Balances.........................................................................24

    E.    Inadequacy of Madoff's Auditors .........................................................26

    F.    Madoff's Returns Did Not Mirror Market Conditions ..........................27

    G.    Madoff Did Not Provide Real-Time Access to IA Business Accounts................27

    H.    Madoff Never Identified his Options Counterparties ............................28

    I.    BLMIS's Paper Trade Confirmations Were Archaic and Replete with Inconsistencies.........................................................................................29

    J.    Madoff Walked Away From Hundreds of Millions of Dollars by Employing a Bizarre Fee Structure.........................................................31

    K.    Many Financial Professionals Publicly Questioned Madoff's Legitimacy ..........32

    L.    BLMIS Account Statements and Confirmations Often Reflected Settlement Anomalies in Options Transactions......................................33

M.  Madoff Purported to Execute Trades That Settled on Days When the Market Was Closed..............................................................35

N.  The HSBC Defendants Created Structured Products to Facilitate Additional Investment in the IA Business ..............................................36

O.  The HSBC Swaps ...................................................................38

P.  The Rye XL Fund Swap ...........................................................39

Q.  The Wickford Fund Swap.........................................................40

R.  The Santa Clara II Fund Options Swap .....................................40

S.  The BNP Paribas Accreting Strike Call Option Transaction.................41

T.  The Gaspee Offshore Swap .......................................................41

U.  The Rye Select Broad Market XL Portfolio Limited Swap...................42

V.  The Wailea Swap ...................................................................42

W.  The Leveraged Note Programs ...................................................43

X.  The STAIRS Note Programs ......................................................43

Y.  HSBC's Due Diligence Indicates It Knew of Madoff's Ponzi Scheme.................44

Z.  HSBC Bank Engaged KPMG to Assess Fraud and Operational Risk at BLMIS and then Ignores its Findings.....................................46

AA.  KPMG Engaged Again and Uncovers HSBC's Failure to Heed Earlier Warnings...................................................................47

VI.  THE AFTERMATH: THE DEFENDANTS UNDERSTATED THEIR FAILURE TO PERFORM DUE DILIGENCE ................................................49

VII.  HSBC HAS HISTORY OF ASSISTING CRIMINAL ENTERPISES .............................50

VIII.  CLASS ACTION ALLEGATIONS ................................................................52

COUNT ONE: KNOWING PARTICIPATION IN A BREACH OF TRUST..............................53

COUNT TWO: AIDING AND ABETTING EMBEZZLEMENT ............................................56

COUNT THREE: AIDING AND ABETTING BREACH OF FIDUCIARY DUTY..................58

COUNT FOUR: AIDING AND ABETTING CONVERSION ...................................................61

- ii -

COUNT FIVE: AIDING AND ABETTING FRAUD UNDER NEW YORK LAW ................ 64

COUNT SIX: UNJUST ENRICHMENT UNDER NEW YORK LAW ....................................... 65

PRAYER FOR RELIEF ................................................................................................................ 66

DEMAND FOR JURY TRIAL ...................................................................................................... 67

010433-11  733527 V1

Plaintiffs Stephen and Leyla Hill and Paul Shapiro ("Plaintiffs") file this class action complaint against defendants HSBC Bank plc; HSBC Holdings plc; HSBC Securities Services (Luxembourg) S.A.; HSBC Institutional Trust Services (Ireland) Limited; HSBC Securities Services (Ireland) Limited; HSBC Institutional Trust Services (Bermuda) Limited; HSBC Bank USA, N.A.; HSBC Securities Services (Bermuda) Limited; HSBC Bank (Cayman) Limited; HSBC Private Banking Holdings (Suisse) S.A.; HSBC Private Bank (Suisse) S.A.; HSBC Fund Services (Luxembourg) S.A.; and HSBC Bank Bermuda Limited (collectively, "HSBC" or "Defendants"). Plaintiffs allege the following upon personal knowledge as to themselves and their own acts, and as to all other matters, upon information and belief, based upon the investigation made by and through their attorneys, and based upon the Trustee investigation set forth in the Amended Complaint (Redacted) filed in the adversary proceeding Case No. 08-1789 (Bankr. S.D.N.Y.). Plaintiffs believe that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## I.    NATURE OF THE ACTION

1.     When a bank is confronted with evidence of a fraud, it should investigate further in order to determine whether or not a fraud is taking place. Here, HSBC violated this rule when it chose to ignore numerous red flags it observed with respect to the Investment Advisory division of Bernard L. Madoff Securities ("IA Business") and continued to facilitate Madoff's transactions. By doing so, HSBC provided substantial assistance to Madoff, thereby extending Madoff's fraud – the largest Ponzi scheme in history – and costing members of the class of innocent customers billions of dollars.

2.     On December 5, 2010, Irving H. Picard ("Trustee"), as trustee for the substantively consolidated liquidation of the business of Bernard L. Madoff Investment

Securities LLC ("BLMIS") under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, *et seq.* ("SIPA"), and the estate of Bernard L. Madoff, by and through its counsel, filed an Amended Complaint (Redacted) in Case No. 08-1789 (Bankr. S.D.N.Y.) against the HSBC Defendants and other entities. On July 28, 2011, the Court dismissed the common law counts 20-24, brought by the Trustee for lack of standing, holding, in effect, that those claims belong to the customers of BLMIS.[1] On June 20, 2013, that ruling was affirmed by the United States Court of Appeals for the Second Circuit.[2] The Trustee then sought a *writ of certiorari* before the United States Supreme Court, and on June 30, 2014, the Supreme Court denied the petition for a writ.[3] By this complaint, Plaintiffs, on behalf of themselves, and on behalf of those BLMIS customers similarly situated, now bring their own claims against the HSBC Defendants, for their participation in the largest Ponzi scheme in history.

3.      In December 2008, shortly after Bernard Madoff's Ponzi scheme was revealed, Madoff claimed he acted alone in perpetrating the largest fraud in history. We now know that contention, like the IA Business, was yet simply another lie. As the facts of Madoff's fraud have come to light over the years since his arrest, it is now known that numerous individuals and financial institutions acted as accomplices and aided Madoff in the perpetration of the largest Ponzi scheme in history. Indeed, without such accomplices, Madoff would not have been able to carry on his fraud as long as he had.

4.      Some of the world's largest banks, like HSBC, were indispensable components to Madoff's crimes. Madoff himself has said so in numerous jailhouse interviews since his arrest.

---

[1]    *See Picard v. HSBC Bank PLC*, 454 B.R. 25 (S.D.N.Y. 2011) (J. Rakoff).

[2]    *See In re Bernard L. Madoff Inv. Secs. LLC*, 721 F.3d 54 (2d Cir. 2013).

[3]    *See Picard v. HSBC Bank plc*, 134 S. Ct. 2895 (2014).

For example, in a February 15, 2011 interview with the *New York Times*, in specifically referring to HSBC, Madoff stated that, "[t]hey had to know . . . but their attitude was sort of 'If you are doing something wrong, we don't want to know.'" As fully set forth below, HSBC either knew of Madoff's fraud, or, in the face of numerous red flags that would have put any reasonably prudent person on notice of Madoff's Ponzi scheme, HSBC made the conscious choice to look the other way.

5.     For more than a decade, HSBC aided Madoff's Ponzi scheme by encouraging investment into an international network of "Feeder Funds,"[4] investment funds which accepted outside investment from investors who wished to invest in Madoff. In turn, these Feeder Funds then invested directly into Madoff's IA business. Feeder Funds were a major source of capital for Madoff, funneling billions of dollars into the Ponzi scheme. Typically, it was European and American investors who would invest in the Feeder Funds. Many of these investors thought they were investing in diverse and thoroughly vetted European funds when, in fact, they were fueling the largest Ponzi scheme in history.

6.     The HSBC Feeder Funds were able to rely primarily on one financial institution – HSBC – to act as their marketer, custodian, and administrator.  In each of these roles, HSBC occupied a position where it was constantly assaulted by red flags connected with Madoff's Ponzi scheme. All of the HSBC Feeder Funds bore HSBC's imprimatur, which was the perfect endorsement to convince foreign (and, ultimately, other American) investors to pour

---

[4]     As defined in this complaint, the term "HSBC Feeder Funds" or "Feeder Funds" refers to the following Madoff feeder funds: Alpha Prime Fund Limited, Defender Limited, Herald Fund SPC, Herald (Lux) SICAV, Hermes International Fund Limited, Kingate Euro Fund, Ltd., Kingate Global Fund Ltd., Lagoon Investment Limited, Landmark, Optimal, Primeo Fund, Senator Fund SPC, Square One, Thema Fund Ltd., Thema International Fund plc, and Thema Wise Investments Ltd.

money into BLMIS. To unknowing investors, the HSBC Feeder Funds appeared to be sound, legitimate investment vehicles because the documents describing those investments were emblazoned with HSBC's brand.

7.      The HSBC Feeder Funds believed that Madoff had graced them with the opportunity to invest in BLMIS and to receive returns generated by his "magic" formula. In many cases during the relevant time period, HSBC sought permission from Madoff to conduct such due diligence. With a few limited exceptions, Madoff refused. Even in those rare instances when the HSBC Defendants were granted permission to perform due diligence on BLMIS, HSBC was allowed only to meet with Madoff himself and no one else from BLMIS, including the firm's compliance officer. Further, certain Feeder Funds feared that an intrusive due diligence process by HSBC would jeopardize the HSBC Feeder Funds' relationships with Madoff. The HSBC Feeder Funds warned HSBC that it had to exhibit appropriate reverence toward Madoff and BLMIS staff during the due diligence process. Probing the secret formula too deeply might evoke Madoff's wrath and spell the end of the Feeder Funds' access to BLMIS. Instead of conducting proper due diligence as it was required to do, HSBC acquiesced in the HSBC Feeder Funds' request not to perform proper due diligence on Madoff, and, in many cases, no due diligence at all.

8.      HSBC was well aware that Madoff and BLMIS were frauds. In yearly internal reports, HSBC identified numerous indicia of fraud at BLMIS, including, but not limited to: Madoff's secrecy, his insistency on retaining custody of all its assets under management, his seemingly supernatural trading performance, BLMIS's untraditional fee structure, and the absence of a qualified auditor.

-4-

9. In addition to lending its brand to the HSBC Feeder Funds, HSBC was also supposed to act as custodian to certain of the Feeder Funds. In that role, HSBC was responsible for safeguarding the assets of the Feeder Funds, namely, the investments (*i.e.*, stocks) that Madoff was purportedly purchasing (but never did) for the Feeder Funds. When HSBC asked Madoff for information about the securities that he was supposedly purchasing, Madoff refused to provide such information. Thus, HSBC was in a position where it could not safeguard the assets of the Feeder Funds. Finding itself in a position where it could not perform its job in any meaningful way, incredibly, HSBC ceded its responsibilities by entering into formal sub-custodian agreements with Madoff in which BLMIS would act as the custodian. In other words, HSBC gave the henhouse to the fox.

10. HSBC is one of the largest and most sophisticated and experienced custodial banks in the world. Given HSBC's knowledge of the numerous red flags it encountered at BLMIS and its extensive experience as a custodial bank, there can only be one inescapable conclusion here – HSBC either knew of Madoff's fraud, or made the deliberate choice to ignore the red flags it encountered at BLMIS.

11. Madoff could not have accomplished or perpetuated his scheme unless the HSBC Defendants agreed to pretend that they were ensuring the existence of assets and trades when, in fact, they did no such thing. Instead, the HSBC Defendants merely delegated their responsibilities to BLMIS. The fees they received for their various roles were nothing more than kickbacks paid for looking the other way while legitimizing BLMIS through their name and brand, making it attractive to investors.

12. HSBC twice retained KPMG to perform due diligence on BLMIS. KPMG twice reported to the HSBC Defendants serious fraud risks and deficiencies, many already known to

the HSBC Defendants. Knowing that BLMIS was likely a fraud, HSBC nevertheless continued to enable Madoff's fraud for their own gain, and when faced with clear evidence that Madoff was perpetrating a fraud, chose to deepen their ties with Madoff. No longer satisfied with being a mere marketing tool, HSBC chose to enmesh itself even further with Madoff by developing derivative structured financial products that poured even more money into BLMIS's IA Business, providing Madoff with additional fuel he needed to sustain his Ponzi scheme.

13.     HSBC either knew of Madoff's fraud, or consciously disregarded the numerous indicia of fraud that surrounded BLMIS. Because of their institutional avarice, what was already a terrible crime was transformed into one of the largest thefts in history. HSBC's unquenchable thirst for the fees paid to it by unsuspecting investors, led it to turn a blind eye to numerous indicia of illegitimate trading activity and fraud, including:

    a.     Madoff refused to meet with HSBC despite the billions of dollars HSBC helped funnel into BLMIS's IA Business;

    b.     Contrary to law and industry practice, BLMIS served as custodian of its customers' funds, *i.e.*, there was no independent third party that could verify either that BLMIS's assets existed or that customer funds were maintained in segregated accounts;

    c.     BLMIS was too good of a deal; Madoff walked away from hundreds of millions of dollars by not charging industry standard management and performance fees. BLMIS also purported to execute trades in a manner that would have required the IA Business to front at least hundreds of millions of dollars to its customers, yet Madoff never charged any of the Feeder Funds for this remarkable accommodation;

- 6 -

d.     BLMIS, which had domestic and international operations with tens of billions of dollars under management, was audited by an unknown and unsophisticated auditor; and

e.     Madoff refused to identify any of BLMIS's options trading counterparties to HSBC or any of the HSBC Feeder Funds and their customers who, collectively, risked billions of dollars in exposure to such counterparties.

14.     HSBC observed all of these red flags of fraud and others, but simply chose to ignore them. As Madoff himself said, HSBC's attitude was "we don't want to know." In a 2001 due diligence report, HSBC noted that the investment community was "baffled" by Madoff and doubted that the split-strike conversion strategy (the "SSC Strategy") that he purported to employ could generate the returns he claimed. HSBC suspected that Madoff might be illegally front-running the market using information he gleaned from his market-making operations or the "potentially greater risk" that Madoff was not, in fact, implementing the SSC Strategy. However, driven by the steady returns BLMIS purported to produce, and the profits it generated, HSBC looked the other way.

15.     Ultimately, HSBC was responsible for directing over $8.9 billion into BLMIS's fictitious IA Business. A September 2008 report commissioned by HSBC estimated that at least 33% of all money invested in Madoff by victims of Madoff's scheme was funneled by and through HSBC. HSBC aided, enabled, and sustained the Ponzi scheme for one simple reason – it was making significant sums of money by doing so. HSBC is liable for the damage they caused, in an amount to be proven at trial, which, upon information and belief, will be in the billions.

16.     Providing the necessary fuel for Madoff's scheme, and actively aiding and abetting the BLMIS criminal enterprise is not an unfamiliar role for HSBC. HSBC has played

- 7 -

central roles in other significant criminal enterprises. For example, in December 2012, HSBC

Holdings plc and HSBC Bank USA, N.A., both defendants here, entered into a deferred

prosecution with the United States government and the New York district attorney's office for

their role in the laundering of $881 million associated with the Sinaloa drug cartel in Mexico. In

connection with these charges, HSBC agreed to pay nearly $2 billion in fines and civil forfeiture.

These charges followed another deferred prosecution agreement entered into between HSBC and

the United States relating to the period 2003-2006, in which HSBC admitted it lacked proper

internal anti-money laundering controls. Despite this most recent deferred prosecution

agreement, news reports from early 2014 indicate that the United States still believes that HSBC

lacks proper internal controls and may bring additional criminal charges against HSBC.

17.     Although the HSBC Defendants played a key role in Madoff's fraud, it was not

the only major bank to do so. For example, in January 2014, JPMorgan announced that it had

entered into a deferred prosecution agreement with the United States, admitting its role in

Madoff's Ponzi scheme, and paying over $2 billion to settle claims with the United States, the

Trustee, and private plaintiffs represented by the undersigned counsel.

## II.     JURISDICTION AND VENUE

18.     This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C.

§1332 and the principles of pendent and supplemental jurisdiction.

19.     This Court has personal jurisdiction over all of the HSBC Defendants pursuant to

N.Y. C.P.L.R. 301 and 302. All of the HSBC Defendants have maintained minimum contacts

with New York in connection with the claims alleged in this complaint. The HSBC Defendants

have purposefully availed themselves of the laws of the State of New York by undertaking

significant commercial activities in New York. The HSBC Defendants derived significant

010433-11 733527 V1

revenue from New York. The HSBC Defendants have committed tortious acts both within and outside of New York, causing injury in New York, and the HSBC Defendants expected or should have reasonably expected those acts to have consequences in New York.

20.     Acting in their capacity as fund administrators and sub-administrators, HSBC Securities Services (Ireland) Limited, HSBC Bank Bermuda Limited, HSBC (Cayman) Limited, HSBC Securities Services (Bermuda) Limited, HSBC Securities Services (Luxembourg) S.A., and HSBC Fund Services (Luxembourg) S.A. (collectively, the "HSBC Administrator Defendants") transmitted instructions to BLMIS in New York, and received from BLMIS trade confirmations, account statements, and other information sent from New York. Further, the HSBC Administrator Defendants also entered into formal contracts with BLMIS in New York to have BLMIS act as sub-administrator. The HSBC Administrator Defendants communicated with BLMIS in connection with their "duties" as fund administrators and were compensated for such communications. The HSBC Administrator Defendants transmitted the false information provided by BLMIS to customers located around the world, including within the United States. The HSBC Administrator Defendants have availed themselves of the laws of the State of New York by undertaking substantial commercial activities in New York.

21.     Each HSBC Administrator Defendant that entered into a sub-administrator agreement with BLMIS engaged BLMIS as its agent to act as the sub-administrator of Feeder Fund assets. BLMIS, acting as an agent on behalf of the HSBC Administrator Defendants, committed multiple torts in the State of New York causing substantial injury to persons in the State of New York and elsewhere in the United States.

22.     Acting in their capacity as fund custodians and sub-custodians, HSBC Institutional Trust Services (Ireland) Ltd., HSBC Securities Services (Luxembourg) S.A., HSBC

Institutional Trust Services (Bermuda) Limited, and HSBC Bank Bermuda Limited (collectively, the "HSBC Custodian Defendants") directed and facilitated the transfer of hundreds of millions of dollars to and from BLMIS in New York. Through these activities, the HSBC Custodian Defendants purposely availed themselves of the laws of the State of New York by undertaking substantial commercial activities in New York and by receiving customer property to their benefit. Furthermore, each of these entities entered into formal sub-custodian contracts with BLMIS in New York in order to delegate their custodial duties to BLMIS. The HSBC Custodian Defendants committed tortious acts both within and outside of New York, causing injury in New York, and reasonably should have expected those acts to have consequences in New York and elsewhere in the United States.

23.     Each HSBC Custodian Defendant that entered into a sub-custodian agreement with BLMIS engaged BLMIS as its agent to act as the sub-custodian of Feeder Fund assets. BLMIS, acting as an agent on behalf of the HSBC Custodian Defendants, committed multiple torts in the State of New York causing substantial injury to persons in the State of New York and elsewhere in the United States.

24.     Acting in their capacity as payee banks, certain HSBC Defendants, including HSBC Bank plc, received and facilitated the transfer of Madoff's criminal proceeds out of BLMIS in New York for the benefit of certain HSBC Feeder Funds, and facilitated the transfer of funds from HSBC Feeder Funds to BLMIS in New York.

25.     Further, certain of the HSBC Defendants, including HSBC Bank plc, and HSBC Bank USA, N.A., increased the flow of funds into Madoff's Ponzi scheme by creating, marketing, and selling structured financial products. Those products facilitated the investment of hundreds of millions of dollars into the Madoff Feeder Funds. The inflow of funds from those

- 10 -

structured products helped to perpetuate Madoff's Ponzi scheme, thus deepening the insolvency of BLMIS and perpetuating Madoff's fraud.

26.     HSBC Bank USA, N.A. is domiciled in the United States, and maintains offices and regularly transacts business in the State of New York.

27.     Venue in this Court is proper under 28 U.S.C. § 1391 because many of the transactions, acts and practices described herein occurred within the jurisdiction of this district.

## III.     THE PARTIES

### A.     The Plaintiffs

28.     Plaintiffs Stephen and Leyla Hill are individuals residing in California. Mr. and Mrs. Hill were customers of BLMIS, and incurred losses and/or damages as a result of the activities alleged herein. Plaintiffs and/or their property and/or estate were injured as a result of the conduct alleged herein. Plaintiffs have suffered injury-in-fact for which Plaintiffs are entitled to seek monetary damages.

29.     Plaintiff Paul Shapiro is an individual residing in New York. Mr. Shapiro was a customer of BLMIS and incurred losses and/or damages as a result of the activities alleged herein. Plaintiff Shapiro and/or his property and/or estate was injured as a result of the conduct alleged herein. Plaintiff Shapiro has suffered injury-in-fact for which he is entitled to seek monetary damages.

### B.     The Defendants

30.     HSBC Holdings plc ("HSBC Holdings") is a public limited corporation, incorporated under the laws of England and Wales, with a principal place of business at 8 Canada Square, London E14 5HQ, United Kingdom. HSBC Holdings is the parent company of

- 11 -

what is known as the HSBC Group, including all of the HSBC entities named as defendants in this complaint.

31.    HSBC Bank plc ("HSBC Bank") is a banking institution incorporated under the laws of England and Wales with a principal place of business at 8 Canada Square, London E14 5HQ, United Kingdom. HSBC Bank was the payee bank for a large number of HSBC Feeder Funds. All moneys that were deposited with BLMIS by many of the HSBC Feeder Funds went through HSBC Bank. All moneys which were withdrawn from BLMIS by these same HSBC Feeder Funds went through defendant HSBC Bank.

32.    HSBC Bank USA, N.A. ("HSBC Bank USA") is a national bank chartered by the Office of the Comptroller of the Currency with a principal executive office at 452 Fifth Avenue, New York, New York 10018 and also with a corporate headquarters at 1800 Tysons Boulevard, Suite 50, McLean, VA. HSBC Bank USA operates many branches in Manhattan and other parts of the United States. Among other things, HSBC Bank USA created structured financial products related to Madoff's IA Business, and entered into transactions involving those structured products, which ultimately served to increase the amount of money invested with BLMIS's IA Business.

33.    HSBC Securities Services (Bermuda) Limited ("HSSB"), is incorporated under the laws of Bermuda with a principal place of business at 6 Front Street, Hamilton HM 11, Bermuda. Upon information and belief, HSSB served as administrator to HSBC Feeder Funds Thema Fund, Ltd., Hermes International Fund Limited, and Alpha Prime Fund Limited (Bermuda), and directed and facilitated the transfer of millions of dollars into and out of BLMIS's IA Business.

34.     HSBC Institutional Trust Services (Bermuda) Limited ("HITSB") is a corporation

organized and existing under the laws of Bermuda with a principal place of business at 6 Front

Street, Hamilton HM 11, Bermuda. HITSB served as the custodian for HSBC Feeder Funds

Alpha Prime Fund Limited (Bermuda), Hermes International Fund Limited, and Thema Fund,

Ltd.

35.     HSBC Bank Bermuda Limited ("HSBC Bank Bermuda"), formerly known as The

Bank of Bermuda Limited, is a banking institution with a principal place of business at 6 Front

Street, Hamilton HM 11, Bermuda. HSBC Bank Bermuda formerly served as the administrator

and custodian of Alpha Prime Fund Limited (Bermuda), Hermes International Fund Limited, and

Thema Fund, Ltd., as well as Square One Fund Limited ("Square One"). HSBC Bank Bermuda

also served as custodian for HSBC Feeder Funds Kingate Euro Fund, Ltd. and Kingate Global

Fund, Ltd. (collectively the "Kingate Funds"). HSBC Bank Bermuda entered into at least one

sub-custodian agreement with BLMIS.

36.     HSBC Securities Services (Luxembourg) S.A. ("HSSL"), formerly known as

Bank of Bermuda (Luxembourg) S.A., is a limited liability company incorporated as a société

anonyme under the laws of the Grand Duchy of Luxembourg, and maintains its principal place of

business at 16 boulevard d'Avranches, 1160 Luxembourg. HSSL served as administrator to

HSBC Feeder Funds Lagoon Investment Limited, Herald Fund SPC, Herald (Lux) SICAV, and

Senator Fund SPC, and, served as the sub-administrator to Alpha Prime Fund Limited

(Bermuda), Hermes International Fund Limited, Thema Fund, Ltd., and Primeo Fund. HSSL also

served as custodian to Lagoon Investment Limited, Herald Fund SPC, Herald (Lux) SICAV,

Primeo Fund, and Senator Fund SPC, and served as sub-custodian to Alpha Prime Fund Limited,

Hermes International Fund Limited, and Thema Fund, Ltd. Also, HSSL engaged BLMIS to act

- 13 -

as its sub-custodian to those Madoff Feeder Funds for which the bank served as custodian or sub-custodian.

37.     HSBC Bank (Cayman) Limited ("HSBC (Cayman)"), which merged into Bank of Bermuda (Cayman) Limited, is a banking institution incorporated and existing under the laws of the Cayman Islands with a principal place of business at HSBC House, 68 West Bay Road, Grand Cayman, KY1-1102, Cayman Islands. HSBC (Cayman) served as the administrator of feeder fund Primeo Fund.

38.     HSBC Private Banking Holdings (Suisse) S.A. ("HSBC Private Banking Holdings (Suisse)") is a majority-owned subsidiary of defendant HSBC Bank existing under the laws of Switzerland, with a principal place of business at Quai du General Guisan, 2, P.O. Box 3580, CH-1211, Geneva 3, Switzerland. HSBC Private Banking Holdings (Suisse) – and/or entities under its control – marketed and directed investor moneys to numerous HSBC Feeder Funds, including Primeo Fund, Herald Fund SPC, Herald (Lux) SICAV, Alpha Prime Fund Limited (Bermuda), Hermes International Fund Limited, and Thema Fund, Ltd., among others.

39.     HSBC Private Bank (Suisse) S.A. ("HSBC Private Bank (Suisse)") is a public company incorporated and existing under the laws of Switzerland, with a principal place of business at Quai du General Guisan, 2, P.O. Box 3580, CH-1211 Geneva 3, Switzerland. It is a subsidiary of HSBC Private Banking Holdings (Suisse). HSBC Private Banking Holdings (Suisse) – and/or entities under its control – marketed HSBC Feeder Funds, including Primeo Fund, Herald Fund SPC, Herald (Lux) SICAV, Alpha Prime Fund Limited (Bermuda), Hermes International Fund Limited, and Thema Fund, Ltd., among others.

40.     HSBC Institutional Trust Services (Ireland) Ltd. ("HITSI") is a limited liability company incorporated under the laws of Ireland with a principal place of business at One Grand

- 14 -

Canal Square, Grand Canal Harbour, Dublin 2, Ireland. HITSI served as custodian to Thema

International Fund, plc and other HSBC Feeder Funds, including Defender Limited, Landmark,

and Optimal Multiadvisors, Ltd. HITSI appointed BLMIS to act as its sub-custodian for those

HSBC Feeder Funds for which it served as custodian.

   41. HSBC Securities Services (Ireland) Ltd. ("HSSI") is a limited liability company

incorporated under the laws of Ireland with a registered office at One Grand Canal Square,

Grand Canal Harbour, Dublin 2, Ireland. HSSI served as administrator to Thema International

Fund, plc, Defender Limited, Landmark, and Optimal Multiadvisors, Ltd.

   42. HSBC Fund Services (Luxembourg) S.A. ("HSBC Fund Services"), formerly

known as Management International (Luxembourg) S.A., is a wholly-owned subsidiary of HSBC

Holdings incorporated under the laws of the Grand Duchy of Luxembourg, and has a registered

address at 16 boulevard d'Avranches, 1160 Luxembourg. HSBC Fund Services acted as sub-

administrator and sub-registrar for Hermes International Fund Limited.

   43. HSBC Holdings, HSBC Bank, HSBC Bank USA, HITSB, HITSI, HSBC Private

Banking Holdings (Suisse), HSBC Private Bank (Suisse), HSSB, HSSI, HSSL, HSBC

(Cayman), HSBC Fund Services, and HSBC Bank Bermuda are referred to collectively herein as

the "HSBC Defendants."

## IV. THE PONZI SCHEME

   44. BLMIS was founded in 1959 by Madoff and, for most of its existence, operated

from its principal place of business at 885 Third Avenue, New York, New York. Madoff, as

founder, chairman, chief executive officer, and sole owner, operated BLMIS together with

several of his friends and family members. BLMIS had three business units: the IA Business,

- 15 -

market-making, and proprietary trading. As we now know, the IA Business was nothing but a Ponzi scheme.

45.     Outwardly, Madoff ascribed the consistent success of the IA Business to the SSC Strategy. Pursuant to that strategy, Madoff purported to invest BLMIS customers' funds in a basket of common stocks within the S&P 100 Index – a collection of the 100 largest publicly traded companies. Madoff claimed that this basket of stocks would mimic the movement of the S&P 100 Index. He also asserted that he would carefully time purchases and sales to maximize value and, correspondingly, BLMIS customers' funds would, intermittently, be out of the market. While out of the market, those funds were purportedly invested in United States Treasury bills or in funds holding Treasury bills. The second part of the SSC Strategy was the hedge of Madoff's stock purchases with S&P 100 Index option contracts. Those option contracts functioned as a "collar" limiting both the potential gains and the potential losses on the baskets of stocks. Madoff purported to use proceeds from the sale of S&P 100 Index call options to finance the cost of purchasing S&P 100 Index put options. Madoff also told IA Business customers, that he would enter and exit the market between eight and twelve times each year.

46.     BLMIS's IA Business customers, including the HSBC Feeder Funds, received fabricated monthly or quarterly statements showing that securities were held in, or had been traded through, their accounts. However, the securities purchases and sales shown in those account statements never occurred, and the trades and reported profits were entirely fictitious. At Madoff's hearing in which he pled guilty, Madoff admitted that he never purchased *any* of the securities he claimed to have purchased for the IA Business's customer accounts. In fact, there is no record of BLMIS having cleared a *single* purchase or sale of securities in connection with the

SSC Strategy on any trading platform on which BLMIS reasonably could have traded securities. Madoff's SSC Strategy was made up out of whole cloth.

47.    At times prior to his arrest, Madoff told customers and regulators that he purchased and sold the put and call options over-the-counter rather than through an exchange. Yet, there is no evidence that Madoff ever purchased or sold *any* of the options described in customer statements. Additionally, the Options Clearing Corporation, which clears all option contracts based upon the stocks of S&P 100 companies, has no record of the IA Business having bought or sold *any* exchange-listed options on behalf of any IA Business customers.

48.    For all periods relevant hereto, the IA Business was operated as a pure Ponzi scheme. BLMIS used its IA Business customers' deposits to pay other customers' redemptions and to make other transfers.

49.    The falsified monthly account statements reported that the accounts of IA Business customers had made substantial gains but, in reality, because it was a Ponzi scheme, BLMIS did not have the funds to pay investors on account of their new investments. BLMIS was able to survive for as long as it did only because it used the stolen principal invested by some customers to pay other customers. Indeed, entities like the HSBC Feeder Funds and the HSBC Defendants, by introducing billions in capital, assisted Madoff and BLMIS in extending the life of the Ponzi scheme.

50.    Madoff's scheme continued until December 2008, when the requests for redemptions overwhelmed the flow of new investments and caused the inevitable collapse of the Ponzi scheme. Madoff was arrested on December 11, 2008, at his home by federal agents.

010433-11 733527 V1

## V.   HSBC KNEW THAT BLMIS'S IA BUSINESS WAS A FRAUD

51.     For years, HSBC encouraged others to invest through BLMIS's IA Business

notwithstanding their explicit awareness that Madoff was engaged in a massive fraud. Despite

observing, and even internally reporting many signs that, at the very least, Madoff was not

investing the way he purported to, the HSBC Defendants made a decision to look the other way

in the face of such red flags, in order to profit from the fees paid by customers in the Feeder

Funds. The red flags were shocking not only for what they demonstrated about Madoff's

investment strategy, but also for what they demonstrated about the depth of the HSBC

Defendants' awareness of the fraud. Any reasonable person in the shoes of HSBC Defendants

would have investigated the red flags further unless they made the choice not to risk exposing the

fraud and thereby sustaining the dual harm of lost profits and litigation exposure.

### A.   Madoff's Secrecy

52.     Although Madoff touted the simplicity of his investment strategy, he refused to

provide even the most basic details about how he implemented that strategy, even though HSBC

funneled over $8.9 billion into BLMIS's fictitious IA Business. Such secrecy was a red flag. As

HSBC noted in a 2001 report regarding HSBC Feeder Fund Greenwich Sentry, L.P. ("Sentry"):

"transparency issues prevent us from conducting a proper due diligence." Yet HSBC had no

problem encouraging its customers to invest in a wide array of identical Madoff funds and

products. Madoff's secrecy repeatedly was identified by the HSBC Defendants, who ultimately

acquiesced in Madoff's inexplicable secrecy and the implication that there was something to

hide.

53.     It would have been obvious that any offering documents of the HSBC Feeder

Funds would at least mention Madoff or BLMIS, since the Feeder Funds' primary or exclusive

- 18 -

investments were with Madoff and BLMIS. However, Madoff insisted to the HSBC Defendants

that his name not be mentioned in the offering documents. HSBC also acquiesced to Madoff's

demands and kept Madoff's name out of offering documents relating to the HSBC Feeder Funds

that HSBC assisted in marketing.

54.     The HSBC Defendants acknowledged that they were concealing Madoff's

identity and role in managing the HSBC Feeder Funds.

**B.      Madoff Insisted on Acting as his Own Custodian**

**1.      The Role of the HSBC Custodian Defendants**

55.     The HSBC Custodian Defendants entered into custodian agreements with

certain of the HSBC Feeder Funds. The following chart depicts these relationships:



In connection with these agreements, the HSBC Custodian Defendants committed to undertaking

significant contractual responsibilities, including maintaining segregated accounts; overseeing

the administration of the payment and redemption of funds; and otherwise transferring,

exchanging, or delivering securities as directed by the HSBC Feeder Funds. One of the primary

roles of the HSBC Custodian Defendants, as is the case with any custodian, was to safeguard the assets of the fund which it is acting as custodian for.

56.    During the relevant time period, the HSBC Custodian Defendants notified BLMIS that they were the custodian of certain HSBC Feeder Funds and that they needed information about the investments Madoff was purportedly making on behalf of the HSBC Feeder Funds. Madoff refused to provide such information. The HSBC Custodian Defendants also did not perform any routine or meaningful activities to verify the existence of the Feeder Fund assets. For example, Madoff told HSBC that the securities he purportedly purchased for his clients were registered in his name at the Depository Trust Company. Had HSBC chosen to verify Madoff's assertions, particularly after it harbored grave concerns about Madoff's business, it would have discovered no such securities registrations existed since Madoff had not purchased any securities.

57.    Therefore, HSBC was in a position where it could not perform its custodial duties. Faced with the prospect of not being able to perform their duties, HSBC, without performing any meaningful due diligence, entered into formal sub-custodian agreements with BLMIS whereby BLMIS would act as custodian. Frank DiPascali negotiated such agreements for BLMIS. The HSBC Custodian Defendants entered into formal sub-custodian agreements in connection with the following Feeder Funds: Thema International Fund plc, Thema Fund Ltd., Thema Wise Investments Ltd., Primeo Fund, Hermes International Fund Limited, Lagoon Investment Limited, Alpha Prime Fund Limited, Herald Fund SPC, Herald (Lux) SICAV, Kingate Euro Fund Ltd., Kingate Global Fund Ltd., Square One Fund Limited, Senator Fund SPC, Defender Limited, and Landmark.

58.     The HSBC Custodian Defendants' delegation of their duties as custodian of Feeder Funds meant that there was no independent oversight over BLMIS's activities, which was critical to sustaining the Ponzi scheme. Obviously, BLMIS did not perform the duties HSBC delegated, and the HSBC Custodian Defendants did not even pretend to supervise BLMIS to ensure that BLMIS performed these duties. Although, as the custodians of the Feeder Funds, they were obligated to do so. The HSBC Custodian Defendants never even questioned why BLMIS was willing to perform these duties without compensation, and did not question the fact that BLMIS insisted on keeping custody of the assets.

59.     Even after delegating these duties, the HSBC Custodian Defendants continued to collect fees and, in total, collected millions in fees for these services.

## 2.     The Delegation of HSBC's Custodial Duties was Illegal

60.     Herald (Lux) was incorporated in Luxembourg as a UCITS compliant *Societe d'Investissement A Capital Variable* ("SICAV") fund, and thus was open to investments from the public at large, rather than being limited to investments from sophisticated investors. Thema International was authorized in 2006 by the Irish Financial Regulator to operate as a UCITS compliant fund in Ireland.

61.     HSSL acted as the custodian of Herald (Lux), and HITSI acted as custodian to Thema International.

62.     UCITS regulations require custodians of fund assets to ensure that the sale, issue, repurchase, and cancellation of securities are carried out in accordance with the law and with the company's articles of incorporation. UCITS regulations also prohibit companies from acting as both investment adviser and custodian, and UCITS regulations require custodians of fund assets to act solely in the interest of the fund's investors.

63.     HSSL and HITSI failed to carry out their duties in compliance with UCITS regulations. HSSL and HITSI did not ensure that BLMIS's investment activities were carried out in accordance with the law. HSSL and HITSI violated UCITS regulations when they entered into sub-custody agreements with BLMIS, the entity that acted as an investment adviser to Herald (Lux) and Thema International. HSSL and HITSI also failed to act solely in the interest of the funds' investors. Indeed, despite being confronted with all of the badges of BLMIS's fraud, the HSBC Custodian Defendants yielded to BLMIS, surrendering billions of dollars to its custody and enabling Madoff's scheme to continue and expand.

64.     HSBC's delegation of its custodial duties violated U.S. industry practices requiring that assets be held by an independent custodian. Without an independent custodian, there can be no independent verification of assets. Madoff was able to conceal his trading – or the lack thereof – because BLMIS acted as prime broker, custodian, and portfolio manager. Given HSBC's extensive experience as one of the world's largest custodial banks, HSBC should easily have recognized Madoff's insistence on keeping custody of the assets he managed for what it was – a hallmark of fraud.

65.     This was pointed out in stark terms by KPMG, the company that the HSBC Defendants retained to review fraud risks at Madoff. KPMG wrote that allowing BLMIS to act as custodian for its own funds created the potential that the trades were "a sham in order to divert client cash."

66.     HSBC itself recognized this as a serious problem. In its own due diligence reviews, HSBC repeatedly pointed to BLMIS's role as a sub-custodian as a fraud risk. For example, HSBC identified as a risk the lack of "independent custody and verification of trading

activity away from the investment manager (unlike a standard hedge fund that has a prime

broker)." HSBC identified this risk every year from at least 2003 through 2008, yet did nothing.

## C.     HSBC as Administrator of Certain HSBC Feeder Funds

67.     In addition to acting as custodian to several HSBC Feeder Funds, several of the

HSBC Defendants also acted as administrators to several Feeder Funds. These HSBC

Administrator Defendants served as administrators, registrars, and service agents pursuant to

agreements with certain HSBC Feeder Funds. The following chart depicts the relationships

between the HSBC Administrator Defendants and the Feeder Funds in which HSBC acted as

administrator:



The HSBC Administrator Defendants were responsible for the day-to-day administration of the funds, which entailed, among other things, issuing and redeeming fund shares, and maintaining the books and records of those funds.

68.     The HSBC Administrator Defendants, among other things, failed to discharge their responsibility of valuing over-the-counter options contracts. To value over-the-counter options contracts, the HSBC Administrator Defendants needed to obtain at least weekly quotations from options trading counterparties, which was never done. Because Madoff would not reveal the identities of purported counterparties, even if the HSBC Administrator Defendants had attempted to verify the value, volume, or existence of any over-the-counter transactions purportedly made by BLMIS, they would not have been able to do so. The HSBC Administrator Defendants' failure to identify the counterparties, despite the obligation to do so, enabled the continuation of the Ponzi scheme.

**D.     Negative Cash Balances**

69.     At times, Madoff appeared to execute the SSC Strategy in a manner which, had it been true, would have left his accountholders with a negative cash balance. This could occur for one of three principal reasons: (i) Madoff did not liquidate a sufficient number of Treasury bills to generate enough cash to purchase a basket of equities; (ii) the account satisfied a redemption request while in the market (BLMIS typically did not purport to sell anything to provide a withdrawal, but simply withdrew money, creating a negative cash event); or (iii) the purported purchase of put options occurred before the sale of corresponding call options, the sale of which was supposed to finance those put options according to the SSC Strategy.

70.     In fact, on 832 separate occasions, certain Madoff feeder fund accounts went into a negative cash position. This was clear based upon a cursory review of the relevant customer

- 24 -

statements. For example, on January 11, 2006, Madoff purported to purchase a basket of equities

on behalf of Primeo Fund's BLMIS account but had not liquidated a sufficient number of

Treasuries to finance the purchase, resulting in a negative cash balance in Primeo Fund's account

in the amount of $78,289,845. Essentially, that meant that Madoff provided Primeo Fund with a

$78 million interest-free loan. Similarly, over a fourteen-day period in November 2005, Primeo

Fund had an average negative balance of $39,786,011. On 129 separate occasions, for a total of

573 days, Primeo's cash balances with Madoff had a negative value, yet Primeo was charged no

interest, nor did Primeo have a margin agreement with BLMIS. No legitimate institution could

advance this amount of money without a margin account, for Primeo's benefit, and none would

have failed to charge interest during these periods. Madoff did not do so. Madoff's failure to

require a margin account and/or charge interest was an alarming red flag. Neither Primeo, nor

Primeo's administrator and custodian, HSBC (Cayman) and HSBC Luxembourg respectively,

questioned it.

71.     As set forth in the following table, the Feeder Funds' BLMIS accounts had

negative cash balances for thousands of days, yet BLMIS never charged them interest for these

extensions of credit:

| | Number of Account Days with a Negative Cash Balance | Number of Instances of Negative Cash Balances |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 112 | 34 |
| Aurelia/Equus Partners | 1,085 | 327 |
| BA Worldwide | 1,045 | 264 |
| Bank Medici | 93 | 34 |
| Defender | 3 | 3 |
| Eurovaleur | 661 | 150 |
| Genevalor | 1,978 | 617 |
| Geo Currencies | 289 | 108 |
| Herald/Herald Management | 64 | 24 |

- 25 -

| | | |
|---|---|---|
| Herald (Lux) | 2 | 2 |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 1,085 | 327 |
| HITSB | 57 | 15 |
| HSBC Administrator | 3,508 | 1,053 |
| HSBC Bank Bermuda | 2,349 | 740 |
| HSBC (Cayman) | 662 | 151 |
| HSBC Custodian | 4,232 | 1,308 |
| HS SB | 1,104 | 333 |
| HS SI/HITS I | 1,106 | 373 |
| HS SL | 2,101 | 591 |
| Kingate Euro | 375 | 128 |
| Kingate Global | 349 | 127 |
| Landmark | 10 | 4 |
| Optimal | 651 | 233 |
| Pioneer | 1 | 1 |
| Primeo Fund | 662 | 151 |
| Senator/Regulus/Carruba | 14 | 4 |
| Square One | 312 | 93 |
| Thema International | 442 | 133 |
| Thema Management BVI | 415 | 125 |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 162 | 49 |

72.     Upon information and belief, the HSBC Defendants did not ever question where Madoff obtained the money he loaned to them. As one of the world's largest lenders, the HSBC Defendants had to recognize the absurdity that Madoff was – literally – lending HSBC's clients hundreds of millions of dollars for no charge whatsoever. But for HSBC's decision to look the other way, HSBC would have known that Madoff was not executing the trades described on customer statements.

**E.     Inadequacy of Madoff's Auditors**

73.     HSBC knew that BLMIS relied on Friehling & Horowitz – an unknown, three-person accounting firm based in a strip mall in Rockland County, New York – to audit a multi-billion dollar investment fund. HSBC was on notice that BLMIS's auditors did not have the competence, resources, technological capabilities, or expertise to perform the domestic and

- 26 -

international auditing functions associated with BLMIS and its billions under management.
Further, HSBC knew that Friehling & Horowitz was not subject to peer review. That BLMIS,
with billions of dollars under management, relied on an auditor like Friehling & Horowitz should
have raised a warning sign with HSBC. Instead, HSBC acted as if nothing were out of the
ordinary and continued to expand their relationships with BLMIS.

      74.     The absurdity of this situation was not lost on HSBC; HSBC Private Bank
identified as a concern "Madoffs lack of [a] realistically independent auditor – Friehling &
Horowitz is a very small firm with Madoff as its only major client." Despite being explicitly
aware of this red flag, HSBC did nothing.

**F.    Madoff's Returns Did Not Mirror Market Conditions**

      75.     BLMIS's IA Business appeared to be immune from any market instability,
enjoying consistent rates of return at all times. For example, through the burst of the dotcom
bubble in 2000, September 11th, and the market downturn in 2008, the SSC Strategy produced
consistent and positive returns. Even during the last 14 months of BLMIS's existence, the IA
Business generated positive returns while the S&P 100 fell nearly 40%. Overall, from January
2000 through November 2008, HSBC Feeder Funds experienced no more than five months of
negative returns, while the S&P 100 experienced 53 months of negative returns over the same
period.

**G.    Madoff Did Not Provide Real-Time Access to IA Business Accounts**

      76.     Despite Madoff's reputation as an early adopter of advanced trading technology,
BLMIS did not provide real-time access to IA Business accounts and sent only paper trade
confirmations to its customers. By the mid-2000s, electronic access and immediate investment
performance information were industry standard, and routinely required by funds of funds which

engaged in real-time hedging. BLMIS, however, transmitted paper copies of trade confirmations to the Defendants and/or their affiliates or representatives three to four days *after* trades purportedly occurred. The HSBC Defendants repeatedly sought to receive trade confirmations electronically through the DTC's electronic systems, yet Madoff refused to do so. His nonsensical explanation was a fear that these service providers would steal his "strategy" or subject BLMIS's computer system to "hacking." Like the other red flags, this was ignored by the HSBC Defendants.

**H.    Madoff Never Identified his Options Counterparties**

77.    Madoff never identified the parties on the other side of the thousands of hedging options transactions he purported to effect each month. This should have been an intolerable practice to the HSBC Defendants, who bore the risk if those counterparties defaulted on the options agreement.

78.    The SSC Strategy purportedly involved the purchase of a basket of between 35 and 50 S&P 100 equities together with a collar of S&P 100 Index put and call options on those stocks to limit the up-side potential and down-side risks. BLMIS purportedly executed agreements with third parties on behalf of account holders pursuant to the "Master Agreement for OTC Options."

79.    At times, Madoff claimed simply to execute over-the-counter options trades with a network of unidentified counterparties, claiming that their identities were proprietary. At other times, he claimed simply that the counterparties were large, European financial institutions. The HSBC Defendants had excellent reasons to care about the identity of Madoff's purported counterparties as, in those options contracts, they understood that it was the HSBC Feeder Funds over which the HSBC Defendants served as custodian and administrator – not BLMIS – that

- 28 -

bore the risk. Thus, the HSBC Defendants could be regularly exposed to hundreds of millions of dollars in potential risk. Had the purported counterparties been unable to meet their obligations, not only would there have been no collar, but the account would have been left exposed to the market without the protections that were so central to the SSC Strategy and they would not have been able to collect on the value of the options contracts.

80.     Despite this potential exposure, the HSBC Defendants, acting as the Feeder Funds' administrator and/or custodian, failed to perform any reasonable, meaningful, or independent inquiry into the counterparties' ability to perform under the contracts. Given the hundreds of millions of dollars at risk had those purported option counterparties been unable to deliver cash as required by the puts and calls, the HSBC Defendants' lack of inquiry or skepticism evinces a disregard for the reasonable, meaningful, and independent due diligence demanded. The HSBC Defendants did not review, comment on, modify, negotiate, or reject any form of draft or final counterparty agreement or OTC transaction confirmation. Despite bearing the risk of the counterparties' failure to perform, the HSBC Defendants had no knowledge of the counterparties' identities. The HSBC Defendants chose to blindly accept Madoff's nonsensical explanations in order to continue to collect their fees. Additionally, the HSBC Defendants should have recognized that under the 1934 Act, Rule 10b-10, states that upon written request, the identity of the counterparty must be disclosed. BLMIS's refusal to provide this information was, in fact, unlawful.

I.     **BLMIS's Paper Trade Confirmations Were Archaic and Replete with Inconsistencies**

81.     The HSBC Defendants received trade confirmations from BLMIS containing numerous inconsistencies that should have raised a red flag that Madoff was not implementing

the SSC Strategy as he purported to do. However, the HSBC Defendants ignored these troubling trade confirmations.

82.     For example, the trade confirmations did not reflect either the reporting or payment of the "Section 31" fees required by NASD and FINRA rules. This should have raised a red flag with the HSBC Defendants.

83.     BLMIS's trade confirmations erroneously characterized options as "trade origins," rather than transactions, on checklists that appeared on the trade confirmations. The trade confirmations did not indicate the origin of those options trades. BLMIS's trade confirmations accurately characterized other transactions, such as purchases of stocks, as "transactions" and accurately indicated the origins of those other transactions. The inaccurate reporting of options transactions on BLMIS's trade confirmations should have raised a red flag with the HSBC Defendants that there were irregularities with BLMIS's options trading; however, the HSBC Defendants failed to make any inquiries into this anomaly.

84.     The trade confirmations also frequently indicated that BLMIS had effected the same trades as both principal and agent. The HSBC Defendants saw, but did not question, this paradox. At times, the front of the BLMIS trade confirmations coded purported trades as "principal transactions" while the backs of the trade confirmations stated, "[w]e have acted in the capacity of Agent for your transaction." The HSBC Defendants were aware of this conflicting language, yet failed to make any inquiries to resolve these inconsistencies.

85.     Finally, BLMIS's option trade confirmations often contradicted Madoff's claim that, from time to time, he purchased options in the over-the-counter market. All of the options trade confirmations contained Committee on Uniform Security Identification Procedures ("CUSIP") identification numbers, which indicated that the options Madoff utilized were S&P

100 Index options that were traded on the CBOE. Because the BLMIS options trade confirmations contained CUSIP numbers tied to the CBOE, the HSBC Defendants should have recognized that BLMIS's purported options trades were not purchased on the over-the-counter market, as Madoff represented.

**J.    Madoff Walked Away From Hundreds of Millions of Dollars by Employing a Bizarre Fee Structure**

86.    In addition to providing interest-free loans on billions of dollars, Madoff imposed an unusual fee structure that, when compared to the fees charged by most investment funds, including those charged by the HSBC Defendants here, meant that Madoff walked away from hundreds of millions, if not billions, of dollars in fees. Instead of charging a 1% - 2% management fee and a 10% - 20% performance fee typical of investment funds, Madoff charged only $0.04 per share on stock transactions, and $1.00 per option contract.

87.    HSBC's Private Bank Due Diligence Team and other investment professionals all were aware that the largesse of this fee structure was an aberration.

88.    Madoff's fee structure effectively abandoned between $255 million and $682 million each year in fees that the HSBC Feeder Funds should have expected to pay. Madoff's explanation, that he was "perfectly happy to just earn commissions," should never have passed serious muster and was another red flag. The HSBC Defendants' own fees were a powerful incentive to overlook Madoff's absurdly generous fee structure.

89.    HSBC Private Bank highlighted Madoff's fee structure as a red flag on at least nine occasions in reports issued between 2001 and 2008. In 2007, for example, HSBC Private Bank noted, "[t]he lack of transparency involving fees paid to Madoff was disturbing." HSBC Private Bank later reached the same conclusion as other investment professionals, stating,

"Things do not add up in terms of Bernie's compensation structure." The HSBC Defendants ignored these warnings, and continued to funnel money into BLMIS through the Feeder Funds.

90.     The HSBC Defendants, as well as the HSBC Feeder Funds, were happy to accept Madoff's minimal commission policy, because the fees went directly into the pockets of those funds' managers and service providers. As HSBC Private Bank noted, "[t]he 20% performance fee goes to Fairfield Sentry." The more money the HSBC Feeder Funds were making, the more money the HSBC Administrator Defendants and the HSBC Custodian Defendants were taking in fees. The HSBC Defendants continued to procure billions of dollars to fuel the Madoff scheme so that they could continue to reap their enormous fees.

**K.    Many Financial Professionals Publicly Questioned Madoff's Legitimacy**

91.     The HSBC Defendants ignored not only the red flags obvious from their relationship with BLMIS's IA Business, but also the warnings of many industry professionals. In May 2001, two industry analysts published articles specifically questioning the legitimacy of BLMIS's operations and its investment performance. AM-AR/Hedge newsletter, entitled "Madoff tops charts; skeptics ask how," reported on industry experts' bewilderment regarding feeder fund Greenwich Sentry LP's consistent returns and how such returns could be achieved so consistently and for so long. The article also observed that "others who use or have used the strategy … are known to have had nowhere near the same degree of success."

92.     On May 7, 2001, Barron's published an article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum." In that article, Barron's reported widespread Wall Street skepticism about BLMIS's IA Business, and noted the lack of transparency regarding the SSC Strategy as a result of Madoff's unwillingness to answer questions.

93.     Both articles suggested that BLMIS had between $6 billion and $7 billion in assets under management. The articles noted that some industry experts speculated that Madoff used information gleaned from his market-making business, such as the bid-ask spreads, to front-run the IA Business's trades and to subsidize and smooth the IA Business's returns.

94.     The Barron's article was circulated within the HSBC Defendants, yet, none who saw the article attempted to follow up on any of the issues it raised. The HSBC Defendants' only response to these articles was to invent their own "answers" – without any independent inquiry – to the troubling questions the articles raised, including whether Madoff was front-running, how Madoff was able to purportedly trade such volumes without noticeably affecting the market, the overall lack of transparency, and why Madoff did not charge industry standard management and performance fees.

95.     In fact, HSBC appended the MAR/Hedge articles to various due diligence reports and often quoted from that article. Upon information and belief, the HSBC Defendants were aware of the Barron's and MAR/Hedge articles and simply chose to ignore the red flags raised therein.

## L.     BLMIS Account Statements and Confirmations Often Reflected Settlement Anomalies in Options Transactions

96.     The HSBC Defendants also ignored that a high percentage of options transactions in their BLMIS accounts settled in a time range outside of industry norms. It is common industry practice for options trades to settle on the business day following execution. However, BLMIS's trade confirmations regularly showed options transactions that purportedly settled as much as three days after execution. This allowed Madoff ample time to fabricate trades days after they purportedly took place. The HSBC Defendants should have been concerned that Madoff's very late settlement policies were enabling fraud. The

- 33 -

frequency with which this occurred was staggering. For example, Herald (Lux) SICAV's

BLMIS account statements and trade confirmations indicate that out of 57 options

transactions purportedly entered into on behalf of Herald (Lux)'s BLMIS account, only six

settled on the business day following execution, meaning that 89.47% of all of the purported

options activity in Herald (Lux)'s account did not comply with standard trading practices.

97.     As set forth in the following table, BLMIS purported to enter into thousands of

options transactions on behalf of the HSBC Feeder Funds' accounts that did not settle on the

business day following the execution of the trade:

| | Options Settling not Settling T+1 | Options - Percentage not Settling T+1 |
|---|---|---|
| Alpha Prime/Alpha Prime Management | 233 | 51.89% |
| Aurelia/Equus Partners | 479 | 25.36% |
| BA Worldwide | 468 | 24.43% |
| Bank Medici | 434 | 69.89% |
| Defender | 98 | 94.23% |
| Eurovaleur | 118 | 16.05% |
| Genevalor | 1,203 | 29.93% |
| Geo Currencies | 231 | 35.76% |
| Herald/Herald Management | 233 | 57.11% |
| Herald (Lux) | 51 | 89.47% |
| Hermes Management/Hermes/Lagoon/HSBC Fund Services | 479 | 25.36% |
| HITSB | 626 | 96.31% |
| HSBC Administrator | 2,511 | 31.60% |
| HSBC Bank Bermuda | 941 | 18.58% |
| HSBC (Cayman) | 130 | 17.40% |
| HSBC Custodian | 3,072 | 30. 42% |
| HS SB | 785 | 35.57% |
| HS SI/HITS I | 975 | 31.95% |
| HS SL | 1,497 | 35.17% |
| Kingate Euro | 239 | 27.47% |
| Kingate Global | 316 | 24.71% |
| Landmark | 76 | 92.68% |
| Optimal | 543 | 27.90% |
| Pioneer | 12 | 100.00% |
| Primeo Fund | 130 | 17.40% |

| Senator/Regulus/Carruba | 136 | 95.77% |
|---|---|---|
| Square One | 237 | 28.18% |
| Thema International | 258 | 28.04% |
| Thema Management BVI | 108 | 14.14% |
| Thema Wise/Thema Fund/Thema Management Bermuda/Equus | 235 | 41.67% |

98.     The Administrator and Custodian accounts did not settle on T + 1 close to one-third of the time.

99.     Settlement anomalies in such high percentages were clear red flags that should have prompted sophisticated financial entities such as the HSBC Defendants to conduct further investigations, request verifications of the trades, and demand more transparency into BLMIS's operations.

**M.     Madoff Purported to Execute Trades That Settled on Days When the Market Was Closed**

100.    Many of the account statements and trade confirmations for HSBC Feeder Funds on which HSBC acted as administrator and/or custodian, reflected trades for which the settlement date and/or the trade date occurred on a weekend. Because the markets are closed on weekends, trade dates are unlikely to fall on weekends, and settlement dates require banks to be open.

101.    For example, the account statements for Lagoon Investment Trust, Optimal, Primeo Fund, Square One Fund Limited, Geo Currencies Ltd., S.A., Kingate Global Fund Ltd., Kingate Euro Fund Ltd., and Thema International for January 2000 all reported the execution of S&P 100 Index put options and S&P 100 Index call options with a trade date of January 7, 2000 (a Friday) and a settlement date of January 8, 2000 (a Saturday), which was impossible. The relevant HSBC Defendants reviewed this trade confirmation and took no action in response to

this anomaly. Rather, this too was ignored by the HSBC Defendants and more than suggests they knew it was a Ponzi scheme.

**N.    The HSBC Defendants Created Structured Products to Facilitate Additional Investment in the IA Business**

102.    Wanting to further maximize their profits from Madoff's Ponzi scheme, HSBC sought other opportunities to help Madoff perpetrate his fraud. Beginning in approximately 2006, the HSBC Defendants created structured financial products (the "Madoff Structured Products"), which directed hundreds of millions of dollars into Madoff's Ponzi scheme through various Feeder Funds. Because of the leverage employed, the Madoff Structured Products offered investors the opportunity to earn a multiple of the returns generated by a Feeder Fund without the upfront capital necessary for a direct investment of that size.

103.    The Madoff Structured Products created a "win-win-win" situation, as all participants exploited Madoff's "success" for their own gains. HSBC, who internally stated that these transactions involved "close to nil risk," earned significant structuring and financing fees in connection with the Madoff Structured Products. The Feeder Funds earned significant management and performance fees because their assets under management increased as the HSBC Defendants invested in the Feeder Funds to hedge their exposure under the Madoff Structured Products. Investors, using borrowed funds, received multiples of the returns generated by the reference asset.

104.    There were two main types of Madoff Structured Products: total return swaps ("swaps") and structured notes ("notes"). A swap is a bilateral financial transaction created to "swap" the cash flows of an asset or basket of assets for cash flows of another asset. Swaps enable investors to achieve multiples of the returns from a reference asset – here, an HSBC Feeder Fund – without having to own the asset. In exchange for paying the leveraged return

on the reference fund at maturity, the financing institution – here, HSBC – collected significant structuring and financing fees on the leveraged amount. A structured note is a financial transaction in which a financial institution issues a note to an investor in exchange for a future payment based on the performance of an underlying reference fund, or index. Like swaps, notes typically employ leverage to provide investors with the possibility of multiples of the returns from the reference asset.

105.   Typically, in both swaps and notes, the financing institution that has promised a leveraged return on the performance of a reference fund will hedge its risk by investing both its own money and the cash collateral provided by the swap counterparty or note purchaser directly in the reference fund. A note or swap investor makes a synthetic investment in a reference fund, because it is entitled at maturity to the leveraged returns generated by the reference fund, but it is the financing institution that is the actual owner of the reference fund shares.

106.   In connection with the marketing and sale of the Madoff Structured Products, the HSBC Defendants were once again confronted by serious red flags that BLMIS's IA Business was not what it purported to be. For example, HSBC admitted its inability to confirm trade data by comparison to an independent data set.

> Calculations on investment guidelines for the underlying funds for these transactions such as risk measures, position and sector concentration percentages are being calculated by Madoff and sent to Product Control [at HSBC]. This process, which differs from the normal process … is due to lack of transparency of detailed fund information.

107.   Similarly, HSBC Bank conceded that a swap done in 2007 needed to be hedged "entirely (no delta exposure) … [because] we do not currently monitor Madoff Strategy trades with sufficient granularity to meet restrictions outlined in the risk mandate …."

108.    In 2008, members of HSBC's Structured Products Group visited Fix Asset Management ("FIX") to conduct a due diligence review of a feeder fund Harley International (Cayman) Limited and FIX. Harley was the reference fund of the structured product transaction under review. HSBC concluded that it was "very familiar" with Madoff's operations and SSC Strategy and was "comfortable with the strategy's risk," so it could "proceed with the transaction." This recommendation came despite the fact that, on multiple occasions, HSBC's own due diligence had raised significant concerns about investing in BLMIS through other channels.

109.    HSBC was aware of numerous red flags regarding Madoff, yet continued to solicit investors for the Madoff Structured Products. In 2005, D. Smith, an officer of an HSBC Feeder Fund that served as a reference fund for one of the total return swaps discouraged HSBC from intruding upon BLMIS through due diligence, and warned that doing so would risk angering Madoff and could endanger the Feeder Funds' ability to invest in BLMIS.

110.    However, despite these warnings, in an email to HSBC, D. Smith acknowledged that Madoff was not a registered investment adviser, that Madoff declined to work with custodians, and that experts in the industry had repeatedly tried, but were unable to replicate BLMIS's strategy and returns. Although the feeder fund advised HSBC of these red flags, HSBC continued to solicit funds for the Madoff Structured Products.

**O.    The HSBC Swaps**

111.    Between June 2006 and September 2007, HSBC Bank USA and HSBC Bank plc entered into seven financing swaps for which the reference funds were several Madoff Feeder Funds. The Madoff Structured Products caused hundreds of millions to be invested with these

- 38 -

Feeder Funds, and, ultimately, into the IA Business, thereby prolonging Madoff's Ponzi scheme and deepening the insolvency of BLMIS.

112.     The seven Madoff Structured Products used the following Feeder Funds as reference assets: (i) Rye Select Broad Market Fund, L.P. ("Broad Market"); (ii) Greenwich Sentry; (iii) Harley International (Cayman) Limited; (iv) Thema International; (v) Senator Fund SPC; and (vi) Rye Select Broad Market Portfolio Limited ("Broad Market Portfolio").

**P.     The Rye XL Fund Swap**

113.     In September 2006, HSBC Bank USA entered into a swap with Rye Select Broad Market XL Fund, L.P. ("Rye XL") with shares of Rye Select Broad Market Fund, serving as the reference fund (the "Rye XL Fund Swap"). As part of the Rye XL Fund Swap, Rye XL received a notional exposure to Broad Market of $140 million. HSBC funded this exposure by charging Rye XL a fee of LIBOR plus 90 basis points.

114.     Initially, the Rye XL Fund Swap had a maximum notional exposure of $300 million, however, due to increased interest in Broad Market, the size of the swap was increased to $350 million in October 2006, and then to $450 million in January 2007. Upon maturity, the Rye XL Swap contemplated a payout to Rye XL of up to 3.5 times the leveraged performance of Broad Market.

115.     HSBC Bank USA, which had direct investment in Broad Market, redeemed $50 million from Broad Market in the fall of 2007, and an additional $13.5 million in the summer of 2008, at a time when it knew or consciously avoided knowing of Madoff's fraud.

**Q.    The Wickford Fund Swap**

116.    In March 2007, HSBC Bank USA entered into a swap transaction with Wickford Fund L.P. ("Wickford"), which provided levered exposure to the returns generated by Greenwich Sentry, L.P. (the "Wickford Fund Swap").

117.    Wickford received a notional exposure to Greenwich Sentry of $10 million in the swap transaction. HSBC Bank USA funded this exposure by charging Wickford a financing fee of LIBOR plus 110 basis points.

118.    Upon maturity, the Wickford Fund Swap contemplated a payout to Wickford of up to 3.5 times the leveraged performance of Greenwich Sentry. HSBC Bank USA, which had a direct investment in Greenwich Sentry, redeemed $13 million from Greenwich Sentry on August 29, 2008, at a time when it knew or consciously avoided knowing of Madoff's fraud.

**R.    The Santa Clara II Fund Options Swap**

119.    In June 2007, HSBC Bank entered into a swap transaction with Santa Clara II Fund ("Santa Clara") that provided Santa Clara with levered exposure to the returns generated by the feeder fund Harley International (Cayman) Limited (the, "Santa Clara Options Swap"). Santa Clara received a maximum notional exposure to Harley International of $300 million in the swap transaction. Upon maturity, the Santa Clara Options Swap contemplated a payout to Santa Clara of up to 4.5 times the leveraged performance of Harley International. HSBC Bank funded this exposure by charging Santa Clara a financing fee of LIBOR plus 110 basis points.

120.    HSBC Bank, which had direct investments in Harley International, made redemptions from Harley International at a time when it knew or consciously avoided knowing of Madoff's fraud.

**S.     The BNP Paribas Accreting Strike Call Option Transaction**

121.    In September 2007, HSBC Bank USA entered into an accreting strike call option transaction, which had the same economics as a total return swap, with BNP Paribas that provided BNP Paribas with levered exposure to the returns generated by Harley International. As part of the BNP Paribas transaction, BNP Paribas received a notional exposure to Harley International of $70 million. HSBC Bank USA funded this exposure by charging BNP Paribas a financing fee.

122.    HSBC Bank USA, which had direct investments in Harley International, made redemptions from Harley International at a time when it knew or consciously avoided knowing of Madoff's fraud.

**T.     The Gaspee Offshore Swap**

123.    Also in July 2007, HSBC Bank entered into a swap transaction with Gaspee Offshore Fund Ltd. ("Gaspee"), which provided levered exposure to Thema International Fund (the "Gaspee Offshore Swap"). As part of the Gaspee Offshore Swap, Gaspee received a notional exposure to Thema International of $12.8 million. HSBC Bank funded this exposure by charging Gaspee a financing fee of LIBOR plus 110 basis points. In 2008, when Thema International was redeemed in full, Senator Fund replaced Thema International as the reference fund.

124.    Upon maturity, the Gaspee Offshore Swap contemplated a payout to Gaspee of up to 3.5 times the leveraged performance of Senator.

125.    HSBC Bank, which had direct investments in Thema International, made redemptions from Thema International and Senator at a time when it knew or consciously avoided knowing of Madoff's fraud.

**U.    The Rye Select Broad Market XL Portfolio Limited Swap**

126.    HSBC Bank entered into a swap transaction in August 2007, with Rye Select Broad Market XL Portfolio Limited ("Rye XL Portfolio"), in which Class D shares of Broad Market Portfolio served as the reference fund (the "Rye XL Portfolio Swap"). As part of the Rye XL Portfolio Swap, Rye XL Portfolio received a notional exposure to Broad Market Portfolio of $56 million. Upon maturity, the Rye XL Portfolio Swap agreement contemplated a payout to Rye XL Portfolio of up to 3.5 times the leveraged performance of Broad Market Portfolio.

127.    HSBC Bank funded this exposure by charging Rye XL Portfolio a fee of LIBOR plus 90 basis points.

128.    HSBC Bank, which had direct investments in Rye XL Portfolio, redeemed $15.9 million from Rye XL Portfolio during the fourth quarter of 2008, a time when it knew or consciously avoided knowing of Madoff's fraud.

**V.    The Wailea Swap**

129.    In September 2007, HSBC Bank USA entered into two swap agreements with Wailea Partners L.P. ("Wailea Partners") and Wailea Offshore Fund Ltd. ("Wailea Offshore Fund"). In both swap transactions, Senator Fund served as the reference fund (respectfully, the "Wailea Offshore Swap" and the "Wailea Partners Swap"). As part of the Wailea Partners Swap, Wailea Partners received a notional exposure of $31 million to Senator Fund. As part of the Wailea Offshore Swap, Wailea Offshore Fund received a notional exposure of $14 million to Senator Fund. Upon maturity, both these swap agreements contemplated a payout to Wailea Partners and Wailea Offshore Fund of up to 3.5 times the leveraged performance of Senator Fund.

130.    HSBC Bank USA funded this exposure by charging Wailea Partners and Wailea Offshore Fund a financing fee of LIBOR plus 110 basis points.

131.    HSBC Bank USA, which had direct investments in Senator Fund, made redemptions from Senator Fund at a time when it knew or consciously avoided knowing of Madoff's fraud.

## W.    The Leveraged Note Programs

132.    By 2006, a number of different financial institutions' leveraged investment vehicles had emerged that, like the Madoff Structured Products, increased investments in the BLMIS IA Business. Between 2005 and 2008, several banks had all created leveraged note programs that offered note purchasers multiples on the returns of an underlying feeder fund to which the note program was linked.

133.    The leveraged note purchasers received multiples of the returns of an underlying fund, without actually owning the asset. These notes created an additional access point through which investors could gain exposure to feeder funds that they otherwise could not invest in due to capacity limitations or minimum investment requirements.

134.    HSBC benefited from leveraged note programs that were linked to the performance of Feeder Funds. As investments in the Feeder Funds increased, through investment in the leveraged note programs, the fees HSBC received also increased.

## X.    The STAIRS Note Programs

135.    HSBC also sought to create leveraged products through which individual high-net worth investors could invest in hedge funds, including gaining exposure to certain Madoff Feeder Funds. Under these leveraged products, which HSBC Bank USA called "leveraged hedge fund basket-linked STAIRS Notes" (the "STAIRS Notes"), individual investors would

receive multiples of the returns generated by a basket of hedge funds selected by HSBC Bank USA. The STAIRS Notes products would have provided yet another avenue by which investors could access BLMIS and by which Madoff could tap into a new source of funds.

136.    For example, as of January 9, 2007, HSBC Bank USA was attempting to create a seven-year STAIRS Notes program, with a notional exposure of $40 million to a reference portfolio comprising two hedge funds – Permal FX Financial and Futures, and Broad Market – a feeder fund that was wholly invested in BLMIS. An investor participating in this STAIRS Note program would have received returns of up to three times that of the referenced fund, less the fees collected by HSBC Bank USA.

137.    The HSBC Defendants also would have benefited from the STAIRS Note programs. For example, in connection with the program described above, HSBC Bank USA would have received net revenues of at least $588,492 in fees during each of the seven years of the STAIRS Note program.

## Y.    HSBC's Due Diligence Indicates It Knew of Madoff's Ponzi Scheme

138.    HSBC Private Banking, HSBC Private Bank Suisse, HSBC Bank USA, and their related affiliates ("HSBC Private Bank") began marketing feeder fund Greenwich Sentry L.P. to its high net-worth clients as early as 1999. On at least nine separate occasions between 2001 and 2009, HSBC Bank USA conducted due diligence on Sentry for the purpose of including the fund on its official platform.

139.    In July 2001, the HSBC Private Bank due diligence team met with Fairfield Greenwich Group ("Fairfield") officers. Fairfield Greenwich Group created and controlled the feeder fund Greenwich Sentry L.P. At this meeting, Stephen Kinne, a high-ranking member of HSBC Bank USA's due diligence team, inquired about the many obvious red flags surrounding

- 44 -

BLMIS, including Madoff's choice to forego lucrative fees, the identities of the counterparties to Madoff's over - the-counter options transactions, and the percentage of securities that Madoff held at the Depositary Trust Corporation. None of the Fairfield representatives provided adequate responses to HSBC Bank USA's questions.

140. On August 7, 2001, HSBC Bank USA issued a due diligence report on Sentry ("2001 Report"). The 2001 Report stated that the due diligence team had been unable to meet with Madoff and that, therefore, the team formed its "opinions" solely on the basis of meetings with Fairfield representatives and a MAR/Hedge article on Madoff. The 2001 Report noted that, without meeting Madoff, there was no way for HSBC to assess Madoff's trading system, risk controls, or compliance procedures. As a result, HSBC Bank USA stated that it was "very difficult" to understand how Madoff was able to make money in such a consistent fashion. The 2001 Report also noted multiple red flags associated with Madoff, including his taking custody of securities and refusal to accept fees at the fund level.

141. In January 2003, HSBC Bank USA issued another due diligence report on Sentry, which noted many of the same concerns addressed in the 2001 Report. According to Research Committee Minutes, David Mullane, a member of the due diligence team, warned, "I would not invest in [Sentry] nor would I want investors to invest."

142. Also in 2003, HSBC Bank USA issued a due diligence report for Ascot Fund, another Madoff feeder fund. The report noted similarities between the investment strategies employed by Ascot Fund and Sentry. HSBC Bank USA gave Ascot Fund a 1 rating, the worst possible score.

143.    In 2004, HSBC Bank USA issued yet another report regarding Sentry. In addition to noting the previously-mentioned red flags, HSBC Bank USA noted the concern that Madoff's track record was "[t]oo good to be true."

**Z.    HSBC Bank Engaged KPMG to Assess Fraud and Operational Risk at BLMIS and then Ignores its Findings**

144.    The red flags signaling Madoff's fraud were apparent to HSBC in September 2005, when HSBC Bank engaged KPMG to review BLMIS for fraud and related operational risk. KPMG's review focused on fraud risks in BLMIS's methods of recording and reporting client funds held by BLMIS and HSBC's ability to detect suspected fraud or misconduct in client funds for which HSBC served as primary custodian. These funds included Thema International, Thema Fund, Hermes International Fund, Primeo Fund, Herald Fund SPC, Alpha Prime Fund Limited, and Square One Fund Limited.

145.    KPMG's findings were encapsulated in a February 16, 2006, 56-page report titled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment Securities LLC" (the "2006 Report"). The 2006 Report, in stark terms, apprised HSBC of clear signs of fraud that would have given any reasonable person in HSBC's position enough information to, at a minimum, warrant further investigation. For example, the 2006 Report identified the risk that "client cash is diverted for personal gain," and "Madoff LLC falsely reports buy/sell trades without actually executing in order to earn commissions." In addition to these concerns, the 2006 Report identified a laundry list of other fraud and related operational risks related to BLMIS's operations including:

- falsification of client mandates;

- embezzlement of client funds;

- use of fabricated client instructions to disguise poor proprietary positions;

- failure to segregate client funds from BLMIS funds;

- inaccurate allocation of reinvested funds from Fidelity across individual accounts;

- manipulation of option prices to maximize commissions;

- use of BLMIS claim funds to settle options exercised against HSBC;

- practice of exercising options without informing the client that the option was set to expire;

- use of client funds to make opportunistic trades that deviated from the SSC Strategy;

- diversion of cash resulting from the sale of equities and Treasury bills;

- systematic over-valuing of positions and the failure to report positions to HSBC in order to manipulate control relationships;

- stocks were not held in client names;

- inflation of call values to disguise misappropriation or poor positions;

- unauthorized trading in client accounts;

- trades executions made by unauthorized BLMIS staff members;

- sham trades to divert client cash;

- front-running order flow in the market-making business;

- false reporting of trades without execution to collect commissions; and

- falsification of trade confirmations.

146.    Despite the litany of risks identified by KPMG, the HSBC Defendants continued, and even deepened, their relationship with Madoff, delegated custodial duties to BLMIS, and did not even lift a finger to investigate the concerns raised by KPMG.

## AA.   KPMG Engaged Again and Uncovers HSBC's Failure to Heed Earlier Warnings

147.    After ignoring KPMG's dire warnings in 2006, the HSBC Defendants asked KPMG to conduct another review of BLMIS in March 2008. The terms and scope of the review

were identical to the 2006 review, except that KPMG was also asked to assess the risk of placing

HSBC investments with BLMIS. The relevant HSBC custodial clients were identified as Primeo

Fund, Lagoon Investment Limited, Alpha Prime Fund Limited, Herald Fund SPC, Herald (Lux)

SICAV, Senator Fund SPC, Thema Wise Investments Limited, Thema International Fund plc,

Defender Limited, Landmark, and Kingate Global Fund Ltd.

148.    KPMG's conclusions were contained in a September 8, 2008, 66-page report

entitled "Review of fraud risk and related operational risks at Bernard L. Madoff Investment

Securities LLC" (the "2008 Report"). KPMG wrote that, according to Madoff, HSBC's client

investments represented an astonishing 33% of BLMIS's assets under management, at the time

about $8 billion.

149.    In the 2008 Report, KPMG identified three additional fraud concerns at BLMIS,

not previously identified in the 2006 Report:

- Client cash is diverted – signatures *falsified* on client instruction in an attempt to legitimize an unauthorized transaction *(i.e.*, redemption).

- Madoff LLC claim funds have been used to settle options exercised against HSBC.

- Stocks are intentionally not allocated a fair price from the bulk trade.

150.    Yet again, the HSBC Defendants ignored KPMG's warnings and

recommendations. The HSBC Defendants, instead, perverted the 2008 Report and used it as a

marketing tool to encourage additional investment in the IA Business. In mid-2008, HSBC was

asked to explain Madoff's investment strategy to Andreas Pirkner, an employee of Bank Medici.

In response, HSBC forwarded to Pirkner the 2008 Report with the comment that the relevant

Feeder Funds were in good shape. The HSBC Defendants continued to exploit their many

relationships with Madoff and BLMIS, burying their heads in the sand, and effectively giving Madoff a "clean bill of health."

## VI.    THE AFTERMATH: THE DEFENDANTS UNDERSTATED THEIR FAILURE TO PERFORM DUE DILIGENCE

151.    After Madoff's arrest on December 11, 2008, in a desperate attempt to preserve their public image with investors, HSBC quickly attempted to hide their failure to investigate the obvious signs of fraud at BLMIS.

152.    Four days later, HSBC Holdings issued a press release attempting to play down the involvement and economic exposure of the HSBC Defendants, commenting:

> In the interests of clarity, HSBC confirms that it has provided financing to a small number of institutional clients who invested in funds with Madoff. On the basis of information presently available, HSBC is of the view that the potential exposure under these financing transactions is in the region of US$1 billion. Also, in the context of its normal global custody business, HSBC has custody clients who have invested with Madoff. HSBC does not believe that these custodial arrangements should be a source of exposure to the Group.

153.    At a plea hearing on March 12, 2009, in the case captioned *United States v. Madoff*,[5] Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorney's Office for the Southern District of New York. Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BMIS]."[6] Additionally, Madoff asserted: "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed *criminal.*"[7] Madoff was sentenced on June 29, 2009, to 150 years in prison.

---

[5]    Case No. 09-CR-213 (DC).

[6]    Plea Allocution of Bernard L. Madoff at 23, *United States v. Madoff,* No. 09-CR213 (DC) (S.D.N.Y. Mar. 12, 2009) (Dkt. No. 50).

[7]    *Id.*

154.    On August 11, 2009, a former BMIS employee, Frank DiPascali, pled guilty to participating in and conspiring to perpetuate the Ponzi scheme. At a plea hearing on August 11, 2009, in the case entitled *United States v. DiPascali*,[8] DiPascali pled guilty to a 10-count criminal information. DiPascali admitted, among other things, that Madoff had been operating a Ponzi scheme since at least the 1980s.[9]

## VII.    HSBC HAS HISTORY OF ASSISTING CRIMINAL ENTERPISES

155.    Assisting Madoff in perpetrating the largest Ponzi scheme in history was not the first time that HSBC has provided substantial assistance to a major criminal enterprise in the pursuit of further profit.

156.    In December 2012, HSBC Holdings, plc, and HSBC Bank, N.A., both defendants in this case, entered into a deferred prosecution with the United States government and the New York County District Attorney's office in connection with their assistance to the world's most violent and dangerous drug cartels during the period 2006 through 2010 (which, not coincidentally, largely falls within the time period Madoff's Ponzi scheme was in existence). In connection with that deferred prosecution agreement, defendants HSBC Holdings, plc, and HSBC Bank, N.A., agreed to pay nearly $2 billion in fines and civil forfeiture. In July 2013, U.S. District Court Judge John Gleeson approved the deferred prosecution agreement. Although the deferred prosecution agreement related to the time period 2006 through 2010, the agreement followed earlier lax anti-money laundering at HSBC pursuant to which HSBC entered into a written agreement with regulators to substantially increase its anti-money laundering activities.

---

[8]    Case No. 09-CR-764 (RJS).

[9]    Plea Allocution of Frank DiPascali at 46, *United States v. DiPascali*, No. 09-CR-764 (KIS) (S.D.N.Y. Aug. 11, 2009) (Dkt. No. 11).

157.    As part of the deferred prosecution agreement, the United States filed a statement

of facts detailing HSBC's complicity in the illicit drug trade ("Statement of Facts").[10] HSBC was

required to "agree and stipulate that [the statement of facts] is true and accurate."

158.    In the Statement of Facts, HSBC admitted that it failed to have proper controls to

monitor money laundering activities and, as a result, nearly $881 million in proceeds from the

Sinaloa drug cartel in Mexico and the Norte del Valle drug cartel in Colombia were passed

through and laundered through HSBC Bank, N.A., by HSBC. In addition, HSBC admitted that it

failed to obtain or maintain due diligence information on its affiliates; failed to monitor over

$200 trillion in wire transfers from 2006 through 2009 from customers in countries HSBC

considered to pose risk of money laundering; failed to adequately monitor billions of dollars in

physical U.S. dollars from other HSBC affiliates; and failed to provide adequate staffing to

monitor such activity. In addition to laundering criminal proceeds, HSBC admitted to

intentionally evading United States economic sanctions in countries such as Sudan, Burma, Iran,

Libya, and Cuba from the mid-1990s through 2006.

159.    Perhaps most shocking, the Statement of Facts reveals that senior executives at

the highest level of HSBC (HSBC Group) were aware of HSBC's assistance in laundering the

proceeds of the illegal drug trade and, rather than taking action to remediate these issues, chose

to do little about it, including failing to inform relevant North American subsidiaries which were

being used to launder the illegal proceeds. According to the Statement of Facts, "[s]enior HSBC

Group executives, including the CEO, Head of Compliance, Head of Audit, and Head of Legal,

were all aware that the problems at HSBC Mexico involved U.S. dollars and U.S. dollar

accounts, but did not contact their counterparts at HSBC Bank USA to explain the significance

---

[10]    http://www.justice.gov/opa/documents/hsbc/dpa-attachment-a.pdf.

- 51 -

of the problems or the potential effect on HSBC Bank USA's business." As a result of this illegal

activity, according to the Statement of Facts, HSBC Group also has a new leadership team,

including a new CEO, Chairman, Chief Legal Officer, and Head of Global Standards Assurance.

160.    Such conduct, which HSBC admitted to in the Statement of Facts, clearly

demonstrates a culture that existed at HSBC, which is entirely consistent with HSBC's

complicity with regard to Madoff's Ponzi scheme.

161.    Notwithstanding the deferred prosecution agreement entered into by HSBC, news

reports from early 2014 indicate that the U.S. government does not believe that HSBC has

remedied the deficiencies in its controls and may bring additional charges and/or enforcement

proceedings.

## VIII.   CLASS ACTION ALLEGATIONS

162.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil

Procedure 23(a) and (b)(3) on behalf of a proposed nationwide class consisting of all persons or

entities who, directly, had capital invested with BLMIS, as of December 12, 2008. Excluded

from the proposed Class are Defendants, their officers and directors, and members of their

immediate families or their legal representatives, heirs, successors or assigns, and any entity in

which Defendants have or had a controlling interest, Bernard L. Madoff, any relatives of Bernard

L. Madoff, and any employees of BLMIS.

163.    The members of the proposed Class are so numerous that joinder of all members

is impracticable. Plaintiffs believe that there are several hundred, if not thousands, of members in

the proposed Class. Members of the proposed Class may be identified from records maintained

by the Defendants.

- 52 -

164.    Plaintiffs' claims are typical of the claims of the members of the proposed Class as all members of the proposed Class are similarly affected by Defendants' wrongful conduct as alleged herein.

165.    Plaintiffs will fairly and adequately protect the interests of the members of the proposed Class and have retained counsel competent and experienced in complex class litigation.

166.    Common questions of law and fact exist as to all members of the proposed Class and predominate over any questions solely affecting individual members of the proposed Class. Among the questions of law and fact common to the proposed Class are:

a.      Whether Defendants aided and abetted in BLMIS's theft from Plaintiffs; and

b.      To what extent the members of the Class have sustained damages, and the proper measure of damages.

167.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joining all members is impracticable, and this action will be manageable as a class action.

**COUNT ONE:**
**KNOWING PARTICIPATION IN A BREACH OF TRUST**

168.    The preceding paragraphs are realleged and incorporated by reference as if set forth fully herein.

169.    In purporting to act as investment advisors, Madoff and/or BLMIS had fiduciary duties to BLMIS customers. Madoff and/or BLMIS were in a position of superior knowledge and expertise to BLMIS customers, who reposed their trust and confidence in Madoff and/or BLMIS. This created a relationship of high trust and confidence whereby Madoff and/or BLMIS were entrusted with the funds BLMIS customers deposited with Madoff and BLMIS.

010433-11 733527 V1

170.    The HSBC Defendants knew that Madoff and/or BLMIS were operating an investment advisory business or, at a minimum, were operating as broker-dealers with authority over discretionary accounts.

171.    The HSBC Defendants further knew that many BLMIS customers were fiduciaries and trustees in their own right who had delegated their fiduciary duties to Madoff and that Madoff exercised fiduciary powers as a trustee or custodian for retirement plans.

172.    Madoff and/or BLMIS breached this trust by embezzling the BLMIS customer funds.

173.    The HSBC Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by embezzling customer funds. At a minimum, the HSBC Defendants were aware of numerous red flags which would have put any reasonable person in HSBC's shoes on notice that Madoff and BLMIS were a Ponzi scheme and that they were embezzling the funds of IA Business customers, and the HSBC Defendants failed to inquire whether Madoff and/or BLMIS were embezzling those funds. Reasonable inquiry, which HSBC intentionally avoided, would have revealed that Madoff and/or BLMIS were embezzling customer funds in breach of their fiduciary duties.

174.    The HSBC Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting customer funds. At a minimum, the HSBC Defendants were aware of suspicious conduct by Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of BLMIS customers, and the HSBC Defendants purposefully failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry, which the HSBC Defendants purposefully avoided, would have revealed

that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

175.    The HSBC Defendants knew of the failure of Madoff and/or BLMIS to ever identify counterparties; the use of backdated investment recommendations; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.

176.    Despite this knowledge, the HSBC Defendants knowingly participated in Madoff's and/or BLMIS's fraud, serving as the sponsor and outward custodian, manager, and administrator of the HSBC Feeder Funds, thereby providing the funds with an appearance of legitimacy, increasing their level of investment as a result of marketing with the HSBC brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; agreed to serve as a mere façade for the HSBC Feeder Funds; and agreed to and implemented irregular procedures that were tailored to accommodate Madoff's suspicious methods.

177.    The HSBC Defendants are therefore liable for all funds Madoff and/or BLMIS misappropriated from investors after the point at which the HSBC Defendants knew, or through reasonable inquiry would have known, that Madoff and/or BLMIS were misappropriating those funds.

178.    As a result of the HSBC Defendants' knowing participation in this breach of trust, customers of BLMIS lost billions of dollars.

## COUNT TWO:
### AIDING AND ABETTING EMBEZZLEMENT

179.    The preceding paragraphs are realleged and incorporated by reference as if set forth fully herein.

180.    Madoff committed a massive embezzling scheme through BLMIS. The HSBC Defendants had actual knowledge of the scheme and provided substantial assistance to Madoff and/or BLMIS in committing the scheme. At a minimum, the HSBC Defendants consciously avoided knowledge of the scheme. The Defendants suspected an embezzlement scheme and realized there was a high probability of such, but refrained from confirming it, in order to later deny knowledge of the scheme. The HSBC Defendants' actions proximately caused the scheme that resulted in billions of dollars in damages to customers of BLMIS.

181.    Plaintiffs bring this claim against all Defendants because, upon information and belief, each Defendant, individually, aided and abetted the embezzlement scheme. In addition, all of the Defendants operated as a single, indivisible entity. Therefore, each of the Defendants is liable for the actions of the other Defendants.

182.    Madoff committed the largest Ponzi scheme in history through BLMIS. Madoff told customers that their money would be invested pursuant to the SSC Strategy, but instead stole that money and did not invest *any* of the customer funds as he claimed. The Ponzi scheme has resulted in billions of dollars in losses to customers of BLMIS.

183.    The HSBC Defendants knew or at least consciously avoided knowledge of the embezzling scheme.

184.    After performing minimal due diligence on Madoff and BLMIS, the HSBC Defendants knew Madoff through BLMIS was embezzling customers' monies. Since at least 2006, the Defendants knew, among other things, that: BLMIS's returns were "too good to be

- 56 -

true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BLMIS; and BLMIS's auditor was unregistered and was not subject to peer review.

185.    The HSBC Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting customer funds. At a minimum, the HSBC Defendants knew of suspicious conduct by Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of BLMIS customers, and the HSBC Defendants purposefully failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

186.    The HSBC Defendants knew of the failure of Madoff and/or BLMIS to ever identify counterparties; the use of backdated investment recommendations; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.

187.    Despite this knowledge, the HSBC Defendants knowingly participated in Madoff's and/or BLMIS's fraud, serving as the sponsor and outward custodian, manager, and administrator of the HSBC Feeder Funds, thereby providing the funds with an appearance of legitimacy, increasing their level of investment as a result of marketing with the HSBC brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS;

agreed to serve as a mere façade for the HSBC Feeder Funds; and agreed to and implemented

irregular procedures that were tailored to accommodate Madoff's suspicious methods.

188.    The Defendants knew Madoff was embezzling. At a minimum, the Defendants

were repeatedly faced with evidence that there was a high probability of embezzling, and made a

conscious decision not to confirm that fact.

189.    The Defendants' assistance was a proximate cause of the Ponzi/embezzlement

scheme. Without the HSBC Defendants' assistance, Madoff and/or BLMIS would not have been

able to continue to operate the scheme for over two decades.

190.    As a result of the HSBC Defendants' aiding and abetting Madoff's and/or

BLMIS's embezzling, customers of BLMIS lost billions of dollars. As a direct and proximate

result of the HSBC Defendants' activities, Plaintiffs lost their investment capital and suffered

damages in an amount to be proven at trial.

### COUNT THREE:
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY

191.    The preceding paragraphs are realleged and incorporated by reference as if set

forth fully herein.

192.    Madoff and/or BLMIS owed a fiduciary duty to BLMIS customers. Madoff

and/or BLMIS breached that fiduciary duty by perpetrating a massive Ponzi scheme through

which they embezzled hundreds of millions of dollars from BLMIS customers. The HSBC

Defendants knowingly participated in the breach, causing harm to customers and creditors. At a

minimum, the HSBC Defendants consciously avoided knowledge of the breach. The HSBC

Defendants suspected Madoff and/or BLMIS were breaching a fiduciary duty and realized there

was a high probability Madoff and/or BLMIS were breaching a fiduciary duty, but refrained

from confirming it, in order to later deny knowledge of the breach.

193.    Madoff and/or BLMIS were in a fiduciary relationship with BLMIS's customers. Madoff and/or BLMIS were in a superior position over BLMIS's customers, which required those customers to repose trust and confidence in Madoff and/or BLMIS. In addition, pursuant to various account agreements BLMIS's customers executed, Madoff and/or BLMIS, agreed to take BLMIS's customers' money and invest it pursuant to the SSC Strategy. Instead, Madoff and/or BLMIS embezzled from BLMIS customers by taking their money and using it to benefit Madoff and others close to him. Madoff and/or BLMIS never made *any* trades or invested any of the money they received from their customers.

194.    The HSBC Defendants knew Madoff and/or BLMIS had a fiduciary duty to BLMIS's customers and that Madoff and/or BLMIS breached that duty. The Defendants were aware that BLMIS was a broker-dealer and an investment adviser, and had reviewed account agreements in which BLMIS agreed to invest customers' money pursuant to specific terms.

195.    The Defendants also knew, or at least consciously avoided the knowledge that, Madoff and/or BLMIS breached that fiduciary duty by engaging in embezzlement.

196.    After performing minimal due diligence on Madoff and BLMIS, the HSBC Defendants knew Madoff through BLMIS was embezzling customers' monies. Since at least 2006, the Defendants knew, among other things, that: BLMIS's returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BLMIS; and BLMIS's auditor was unregistered and was not subject to peer review.

197.    The HSBC Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting customer funds. At a minimum, the HSBC Defendants knew of suspicious conduct by Madoff and/or BLMIS that would have led a

reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of BLMIS customers, and the HSBC Defendants purposefully failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious conduct was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

198.    The HSBC Defendants knew of the failure of Madoff and/or BLMIS to ever identify counterparties; the use of backdated investment recommendations; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.

199.    Despite this knowledge, the HSBC Defendants knowingly participated in Madoff's and/or BLMIS's fraud, serving as the sponsor and outward custodian, manager, and administrator of the HSBC Feeder Funds, thereby providing the funds with an appearance of legitimacy, increasing their level of investment as a result of marketing with the HSBC brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; agreed to serve as a mere façade for the Feeder Funds; and agreed to and implemented irregular procedures that were tailored to accommodate Madoff's suspicious methods.

200.    The Defendants knew Madoff and/or BLMIS were breaching a fiduciary duty to BLMIS's customers.

201.    The HSBC Defendants' assistance was a proximate cause of the breach. Without the HSBC Defendants' assistance, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi/embezzling scheme for over two decades.

202. As a result of the HSBC Defendants' aiding and abetting this breach of fiduciary duty, customers of BLMIS lost billions of dollars. As a direct and proximate result of the HSBC Defendants' activities, Plaintiffs and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

**COUNT FOUR:**
**AIDING AND ABETTING CONVERSION**

203. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

204. Through the IA Business, Madoff and/or BLMIS unlawfully converted billions of dollars of investor funds.

205. Plaintiffs and members of the class, as BLMIS customers, have a legal right and interest in the billions of dollars they personally invested with BLMIS. Madoff and/or BLMIS exercised unauthorized dominion and control over this customer property in derogation of BLMIS customer rights by failing to invest customer property pursuant to the SSC Strategy. Instead, Madoff and/or BLMIS used BLMIS customers' money to make payments to friends and family and to fund redemptions of other investors. Madoff and/or BLMIS's unauthorized use of customer property resulted in the wrongful conversion of BLMIS customers' specifically identifiable funds.

206. The HSBC Defendants had actual knowledge of the conversion and lent substantial assistance to Madoff and/or BLMIS in converting these monies. The HSBC Defendants suspected, and even realized there was a high probability, that Madoff and/or BLMIS were converting BLMIS customers' money, but refrained from confirming their suspicions in order to later deny knowledge of the conversion. The HSBC Defendants' actions proximately

caused the conversion that resulted in billions of dollars in damages to customers, creditors, and/or BLMIS.

207.    The HSBC Defendants were aware that Madoff and/or BLMIS were a broker-dealer and an investment adviser, and had reviewed account agreements in which Madoff and/or BLMIS agreed to invest BLMIS customers' money pursuant to specific terms.

208.    Madoff and/or BLMIS converted billions of dollars of BLMIS customers' money. Madoff and/or BLMIS told BLMIS customers that he would invest their money pursuant to the SSC Strategy, but instead embezzled that money and did not invest any of the funds as he claimed.

209.    After performing minimal due diligence on Madoff and BLMIS, the Defendants knew Madoff through BLMIS was embezzling customers' monies. Since at least 2006, the Defendants knew, among other things, that: BLMIS's returns were "too good to be true" and could not be reconciled with market conditions; there was a lack of transparency surrounding Madoff and/or BLMIS; and BLMIS's auditor was unregistered and was not subject to peer review.

210.    The HSBC Defendants knew that Madoff and/or BLMIS were breaching their fiduciary duties by misappropriating and diverting customer funds. At a minimum, the HSBC Defendants knew of suspicious conduct by and facts concerning Madoff and/or BLMIS that would have led a reasonably prudent person to suspect that Madoff and/or BLMIS were misappropriating and diverting the funds of BLMIS customers, and the HSBC Defendants failed to inquire whether Madoff and/or BLMIS were misappropriating and diverting those funds. Reasonable inquiry would have revealed that the only plausible explanation for the suspicious

conduct was that Madoff and/or BLMIS were misappropriating and diverting the customer funds in breach of their fiduciary duties.

211.    The HSBC Defendants knew of the failure of Madoff and/or BLMIS to identify counterparties; the use of backdated investment recommendations; the use of delayed, hard copy-only trade confirmations by Madoff and/or BLMIS; Madoff's and/or BLMIS's reporting of stock trades that were outside the range of prices for such stocks on the reported days; and Madoff's and/or BLMIS's use of a small, unknown auditing firm.

212.    Despite this knowledge, the HSBC Defendants knowingly participated in Madoff's and/or BLMIS's fraud, serving as the sponsor and outward custodian, manager and administrator of the HSBC Feeder Funds, thereby providing the funds with an appearance of legitimacy, increasing their level of investment as a result of marketing with the HSBC brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS; agreed to serve as a mere façade for the Feeder Funds; and agreed to and implemented irregular procedures that were tailored to accommodate Madoff's suspicious methods.

213.    The HSBC Defendants' assistance was a proximate cause of the conversion. Without it, Madoff and/or BLMIS would not have been able to continue to operate the Ponzi/embezzling scheme for over two decades.

214.    As a result of the HSBC Defendants' aiding and abetting Madoff's and/or BLMIS's conversion, customers of BLMIS lost billions of dollars. As a direct and proximate result of the HSBC Defendants' activities, Plaintiffs and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## COUNT FIVE:
## AIDING AND ABETTING FRAUD UNDER NEW YORK LAW

215. Plaintiffs incorporate by reference the allegations contained in the foregoing paragraphs as if set forth fully herein.

216. As set forth above, BLMIS was engaged in a complex and longstanding plan to enrich itself at the expense of investors. As part of this plan, BLMIS repeatedly made false statements regarding the sale and repurchase of securities and other financial instruments, the value of investor accounts, and the total value of assets under management. Although Madoff collected billions from investors, during the existence of BLMIS, Madoff never purchased a single security.

217. The HSBC Defendants, as set forth above, had actual knowledge of the fraud committed by BLMIS, were aware of numerous red flags strongly suggesting that BLMIS was engaged in fraudulent activity, and/or consciously avoided BLMIS's fraud. By virtue of their long-standing relationships with BLMIS, their multiple investigations into BLMIS, their communications with clients and investors of the HSBC Feeder Funds, and their roles as managers, advisers, administrators, and custodians of the HSBC Feeder Funds, the HSBC Defendants knew that BLMIS was engaged in fraudulent activity.

218. The HSBC Defendants were confronted with myriad red flags and indicia of fraud on the part of BLMIS and, by failing to investigate further, consciously avoided the clear deficiencies and evident falsities associated with BLMIS. To the extent that the HSBC Defendants consciously avoided facts that, if confirmed, would have laid bare the fraudulent nature of the Ponzi scheme, the HSBC Defendants had actual knowledge of BLMIS's breach.

219.    As a direct and reasonably foreseeable result of (a) BLMIS's fraud and (b) the
HSBC Defendants aiding and abetting in that fraud, investors in BLMIS have suffered
substantial injury.

**COUNT SIX:**
**UNJUST ENRICHMENT UNDER NEW YORK LAW**

220.    Plaintiffs incorporate by reference the allegations contained in the foregoing
paragraphs as if set forth fully herein.

221.    The HSBC Defendants have unjustly benefitted through their receipt of customer
property that they acquired only as a result of perpetuating and participating in Madoff and/or
BLMIS's Ponzi/embezzling scheme.

222.    The HSBC Defendants earned these benefits at the expense of BLMIS customers,
creditors, and/or BLMIS and cannot justly retain them. Faced with the prospect of losing fees
and profits, the HSBC Defendants chose to ignore compelling evidence of Madoff and/or
BLMIS's embezzling scheme. For example, the HSBC Defendants were privy to the suspicious
and inadequate information received from HSBC Feeder Funds while conducting due diligence
in anticipation of structuring and issuing products, and a plethora of other evidence of fraud as
detailed above.

223.    The Defendants helped perpetuate Madoff's and/or BLMIS's fraudulent scheme
by ignoring the evidence of embezzling and continuing to structure and sell investment vehicles
in BLMIS to its customers in order to keep the Ponzi scheme running and continue to enrich
itself in the process.

224.    Equity and good conscience require full restitution of the monies received by the
HSBC Defendants, directly and indirectly, from BLMIS. This includes not only the proceeds
received from their customers, but also any profits made from its use of this money.

010433-11 733527 V1

Additionally, any profits and fees the HSBC Defendants earned through their use of the customer property is recoverable by the Plaintiffs and the Class as restitution.

225.    The HSBC Defendants' actions resulted in a loss in the billions of dollars.  As a direct and proximate result of the HSBC Defendants' activities, Plaintiffs and the Class lost their investment capital, and suffered damages in an amount to be proven at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

A.    Determining that this action is a proper class action, certifying Plaintiffs as class representatives under Rule 23 of the Federal Rules of Civil Procedure and Plaintiffs' counsel as Class Counsel;

B.    Awarding compensatory and/or consequential damages and, as permitted by law, exemplary and punitive damages in favor of Plaintiffs, and on behalf of all other Class members, against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in specific amounts of compensatory, exemplary, and punitive damages to be determined at trial, including interest and any enhanced damages thereon;

C.    Awarding Plaintiffs and the Class restitution of monies Defendants received from Madoff and/or BLMIS and any profits earned through Defendants' use of these monies;

D.    Establishment of a constructive trust over the proceeds of the unjust enrichment of Defendants in favor of the Plaintiffs and the Class;

E.    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including attorneys' fees and expert fees; and

F.    Such other and further relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs hereby demand a trial by jury, pursuant to Rule 38(b) of the Federal Rules of

Civil Procedure, of all issues so triable.

DATED: December 10, 2014

HAGENS BERMAN SOBOL SHAPIRO LLP

By _____
       Jason A. Zweig (JZ-8107)
555 Fifth Avenue, Suite 1700
New York, NY 10017
Telephone:  (212) 856-7227
Facsimile:  (917) 210-3980
jasonz@hbsslaw.com

Steve W. Berman
HAGENS BERMAN SOBOL SHAPIRO LLP
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Telephone:  (206) 623-7292
Facsimile:  (206) 623-0594
steve@hbsslaw.com

Reed R. Kathrein
HAGENS BERMAN SOBOL SHAPIRO LLP
715 Hearst Avenue, Suite 202
Berkeley, CA 94710
Telephone:  (510) 725-3000
Facsimile:  (510) 725-3001
reed@hbsslaw.com

Andrew J. Entwistle
Vincent R. Cappucci
Arthur V. Nealon
Robert N. Cappucci
ENTWISTLE & CAPPUCCI LLP
280 Park Avenue
26th Floor West
New York, New York 10017
Telephone:  (212) 894-7200
Facsimile: (212) 894-7272

*Counsel for Plaintiffs*