UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
--------------------------------------------------------x

STEPHEN HILL et al.,

        Plaintiffs,

    -v-                                No.  14CV09745-LTS

HSBC BANK PLC et al.,

        Defendants.

--------------------------------------------------------x


MEMORANDUM OPINION AND ORDER

        Plaintiffs brought a class action against the various HSBC-affiliated Defendants ("HSBC" or "HSBC Defendants"),[1] who served as custodians and administrators to certain "feeder" funds that invested in Bernie Madoff's Po nzi scheme, alleging four claims: aiding and abetting breach of fiduciary duty (Count Three); aiding and abetting conversion (Count Four); aiding and abetting fraud (Count Five), and unjust enrichment (Count Six).  (Am. Compl. ¶¶ 191-225.)[2]  Defendants have moved to dismiss the amended class action complaint ("Amended

---

[1]      HSBC Defendants are: HSBC Bank plc; HSBC Securities Services (Luxembourg) S.A.; HSBC Institutional Trust Services (Ireland) Limited; HSBC Securities Services (Ireland) Limited; HSBC Institutional Trust Services (Bermuda) Limited; HSBC Bank USA, N.A.; HSBC Securities Services (Bermuda) Limited; HSBC Bank (Cayman) Limited; HSBC Private Bank Holdings (Suisse) S.A.; HSBC Private Bank (Suisse) S.A.; HSBC Fund Services (Luxembourg) S.A.; and HSBC Bank Bermuda Limited.

[2]      On October 27, 2015, Plaintiffs withdrew their claims for knowing participation in breach of trust (Count One) and aiding and abetting embezzlement (Count Two).  (Stip. & Consent Order, docket entry no. 25.)

Complaint") pursuant to the Securities Litigation Uniform Standard Act of 1998 ("SLUSA") and Federal Rules of Civil Procedure 12(b)(2), 12(b)(6), and 9(b).

The Court has subject matter jurisdiction of the action pursuant to 28 U.S.C. §1332.

The Court has carefully reviewed the parties' papers.  For the following reasons, the Defendants' motion to dismiss the Amended Complaint is granted.

BACKGROUND

The allegations relevant to this motion practice are summarized below.

Plaintiffs are individuals who maintained discretionary accounts at Bernard L. Madoff Investment Securities LLC ("BLMIS"), which gave Madoff and BLMIS complete discretion over which investments they would purportedly make for Plaintiffs.  (Id. ¶ 30.) Plaintiffs "were willing to maintain discretionary accounts with BLMIS and were induced to invest with Madoff for one simple reason—they wished to receive the extraordinary returns that Madoff had become known for by virtue of his investment expertise."  (Id. ¶ 31.)  Plaintiffs allege that they never had an expectation that Madoff and/or BLMIS would be purchasing specific securities or other assets for their accounts, or that Madoff would adhere to any specific investment strategy.  (Id.)  Plaintiffs could not direct Madoff to purchase a specific security; Madoff had complete control over the accounts, and was the only person who purportedly purchased securities and other assets for Plaintiffs' accounts.  (Id.)  Plaintiffs allege that "[t]o Plaintiffs, Madoff acted as their 'banker' and BLMIS as their 'bank' as well as their investment manager and fiduciary."  (Id.)

Plaintiffs allege that HSBC aided and abetted Madoff's Ponzi scheme by encouraging investment into an international network of "Feeder Funds," or investment funds that accepted outside investment from investors who wished to invest in Madoff.  (Id. ¶ 5.)  The Feeder Funds then invested directly into Madoff's Investment Advisory ("IA") business.  (Id.)  BLMIS's IA business customers, including the HSBC Feeder Funds, received fabricated monthly or quarterly statements showing the transactions Madoff was purportedly allocating to their accounts.  (Id. ¶ 47.)  However, the assets shown as allocated to those accounts never existed, and the reported profits were entirely fictitious.  (Id.)  Plaintiffs allege that, despite being aware of serious red flags concerning the operation of BLMIS, including the results of due diligence conducted by KMPG on its behalf, HSBC continued to market and sell structured financial products that directed hundreds of millions of dollars into Madoff's Ponzi scheme through various Feeder Funds.  (See, e.g., id. ¶¶ 102, 106, 144-45.)  Plaintiffs allege that HSBC was "well aware that Madoff and BLMIS were frauds."  (Id. ¶ 8.)

Plaintiffs allege that HSBC Defendants assisted Madoff in perpetuating the Ponzi scheme by consciously avoiding knowledge of numerous red flags and suspicious conduct, and failing to conduct a reasonable inquiry, which would have resulted in the revelation of Madoff's Ponzi scheme.  (See id. ¶ 174.)  HSBC Defendants, instead, continued to lend their name to the scheme, serving as the "sponsor and outward custodian, manager, and administrator of the HSBC Feeder Funds, thereby providing the funds with an appearance of legitimacy, increasing their level of investment as a result of marketing with the HSBC brand, and providing the infrastructure for more than a billion dollars in investments into BLMIS."  (Id. ¶ 176.)  Therefore, Plaintiffs allege, HSBC Defendants are "liable for all funds Madoff and/or BLMIS misappropriated from investors after the point at which the HSBC Defendants knew, or through

reasonable inquiry would have known, that Madoff and/or BLMIS were misappropriating those funds." (Id. ¶ 177.)  As a result of HSBC Defendants' knowing participation in the Madoff scheme, BLMIS customers lost billions of dollars.  (See id. ¶ 178.)

Defendant HSBC Holdings plc ("HSBC Holdings") is a public limited corporation, incorporated under the laws of England and Wales, with a principal place of business in the United Kingdom.  (Id. ¶ 32.)  HSBC Holdings is the parent company of what is known as the HSBC Group, which includes all of the HSBC entities named as defendants.  (Id.) Plaintiffs allege that all HSBC Defendants have maintained minimum contacts with New York in connection with the claims alleged in the Amended Complaint, have purposefully availed themselves of the laws of New York by undertaking significant commercial activities, and have committed tortious acts both within and outside of New York, causing injury in New York.  (Id. ¶ 19.)

Specifically, Plaintiffs allege that the HSBC Administrator Defendants,[3] "[a]cting in their capacity as fund administrators and sub-administrators . . . transmitted instructions to BLMIS in New York, and received from BLMIS trade confirmations, account statements, and other information sent from New York." (Id. ¶ 20.)  The HSBC Administrator Defendants "also entered into formal contracts with BLMIS in New York to have BLMIS act as sub-administrator . . . [and] communicated with BLMIS in connection with their 'duties' as fund administrators and were compensated for such communications." (Id.)  "Each HSBC Administrator Defendant that entered into a sub-administrator agreement with BLMIS engaged BLMIS as its agent to act

---

[3]    Plaintiffs define the subset of HSBC Administrator Defendants as: HSBC Securities Services (Ireland) Limited; HSBC Bank Bermuda Limited; HSBC (Cayman) Limited; HSBC Securities Services (Bermuda) Limited; HSBC Securities Services (Luxembourg) S.A.; and HSBC Fund Services (Luxembourg).

as the sub-administrator of Feeder Fund assets." (<u>Id.</u> ¶ 21.)  Plaintiffs further allege that the

HSBC Administrator Defendants "transmitted the false information provided by BLMIS to

customers located around the world, including within the United States." (<u>Id.</u> ¶ 20.)

Plaintiffs allege that HSBC Custodian Defendants,[1] "[a]cting in their capacity as

fund custodians and sub-custodians, . . . directed and facilitated the transfer of hundreds of

millions of dollars to and from BLMIS in New York." (<u>Id.</u> ¶ 22.)  Plaintiffs allege that,

"[t]hrough these activities, the HSBC Custodian Defendants purposely availed themselves of the

laws of the State of New York by undertaking substantial commercial activities in New York

and by receiving customer property to their benefit." (<u>Id.</u>)  Each of the HSBC Custodian

Defendants "entered into formal sub-custodian contracts with BLMIS in New York in order to

delegate their custodial duties to BLMIS" and "engaged BLMIS as its agent to act as the sub-

custodian of Feeder Fund assets." (<u>Id.</u> ¶¶ 22-23.)

Plaintiffs allege that, "[a]cting in their capacity as payee banks, certain HSBC

Defendants, including HSBC Bank plc, received and facilitated the transfer of Madoff's criminal

proceeds out of BLMIS in New York for the benefit of certain HSBC Feeder Funds, and

facilitated the transfer of funds from HSBC Feeder Funds to BLMIS in New York." (<u>Id.</u> ¶ 24.)

Plaintiffs allege that "certain of the HSBC Defendants, including HSBC Bank plc, and HSBC

Bank USA, N.A., increased the flow of funds into Madoff's Ponzi scheme by creating,

marketing, and selling structured financial products." (<u>Id.</u> ¶ 25.)  Plaintiffs also allege that

HSBC Bank plc engaged KPMG in 2005 to review BLMIS for fraud and related operational risk

---

[1]     Plaintiffs define the HSBC Custodian Defendants as: HSBC Institutional Trust Services
(Ireland) Limited.; HSBC Securities Services (Luxembourg) S.A.; HSBC Institutional
Trust Services (Bermuda) Limited; and HSBC Bank Bermuda Limited.

(id. ¶ 144) and that HSBC asked KPMG to conduct another review of BLMIS in 2008 (id. ¶¶ 144, 147).  HSBC Bank USA, N.A. is domiciled in the United States, and maintains offices and regularly transacts business in New York.  (Id. ¶ 26.)


I.          Personal Jurisdiction

        HSBC moves to dismiss the Amended Complaint as against all Defendants other than HSBC Bank USA, N.A. ("Foreign Defendants") for lack of personal jurisdiction.  (Defs. Br. at 31.)  "In deciding a motion to dismiss for lack of personal jurisdiction, the court has discretion to proceed either upon written submissions or through a full evidentiary hearing on the merits, but without a hearing or jurisdictional discovery, the pleadings and affidavits are construed, and any ambiguity is resolved, in favor of the plaintiff."  Fagan v. Republic of Austria, No. 08 CV 6715, 2011 WL 1197677, at *11 (S.D.N.Y. Mar. 25, 2011) (internal quotation marks and citation omitted).  In assessing personal jurisdiction, "the court must look first to the long-arm statute of the forum state, in this instance, New York."  Bensusan Rest. Corp. v. King, 126 F.3d 25, 27 (2d Cir. 1997) (citation omitted).  Second, "[i]f the exercise of jurisdiction is appropriate under that statute, the court then must decide whether such exercise comports with the requisites of due process."  Id. (citation omitted).

        Plaintiffs do not claim that there was general jurisdiction over any of the Foreign Defendants (see Pls. Opp. at 35-40), leaving specific jurisdiction as the only mechanism by which this Court can assert personal jurisdiction.  The New York long-arm statute authorizes specific personal jurisdiction over any non-domiciliary who, in person or through an agent, "(1) transacts any business within the state or contracts anywhere to supply goods or services in the state; or (2) commits a tortious act within the state . . . ."  N.Y. CPLR § 302(a).  Plaintiffs

contend that Foreign Defendants are subject to specific personal jurisdiction pursuant to N.Y.

C.P.L.R. Sections 302(a)(1) and (2).  (See Pls. Opp. at 35-40.)

    "To establish personal jurisdiction under § 302(a)(1), two requirements must be

met: (1) The defendant must have transacted business within the state; and (2) the claim asserted

must arise from that business activity."  Barrett v. Tema Dev. (1988), Inc., 251 F. App'x 698,

700 (2d Cir. 2007) (internal quotation marks and citation omitted).  A foreign party "transacts

business" in New York when, looking at the totality of the circumstances, he "purposefully

avails [himself] of the privilege of conducting activities within [New York], thus invoking the

benefits and protections of its laws."  Fagan, 2011 WL 1197677, at *13 (internal quotation marks

and citations omitted).  "Random," "fortuitous," or "attenuated" contacts will not be sufficient.

SAS Grp., Inc. v. Worldwide Inventions, Inc., 245 F. Supp. 2d 543, 548 (S.D.N.Y. 2003)

(internal quotation marks and citation omitted).  It is the "nature and quality" and not the amount

of New York contacts that determine whether purposeful activity occurred.  Id. (internal

quotation marks and citation omitted).  Accordingly, a foreign defendant's communications with

a party in New York or sending of monies into New York are not sufficient to establish personal

jurisdiction without the defendant having "projected" himself into New York for the purposes of

conducting business there.  See Roper Starch Worldwide, Inc. v. Reymer & Associates, Inc., 2 F.

Supp. 2d 470, 474 (S.D.N.Y. 1998); see, e.g., Casio Computer Co. v. Sayo, No. 98 CV 3772,

2000 WL 1877516, at *26 (S.D.N.Y. Sept. 20, 1999) (wiring funds to, from, or through New

York insufficient for personal jurisdiction); Rushaid v. Pictet & Cie, 127 A.D.3d 610, 611 (N.Y.

App. Div. 2015) (carrying out client's instructions using correspondent accounts in New York to

effectuate wire transfers insufficient for purposeful availment of New York laws).  Similarly,

communications with and payments to New York merely to ensure compliance with contract

terms negotiated and executed outside of New York do not "project" a defendant into the state sufficiently to confer personal jurisdiction over it under § 302(a)(1).  See Roper, 2 F. Supp. at 474-75.  In short, the contacts with New York must provide "a fair warning to defendant of the possibility of being haled into court [there]."  See Avecmedia, Inc. v. Gottschalk, No. 03 CV 7831, 2004 WL 1586411, at *4 (S.D.N.Y. Jul. 14, 2004).[5]  In addition, to satisfy the "arise from" requirement, Plaintiffs must demonstrate that there is "some articulable nexus between the business transacted and the cause of action sued upon."  Ross v. UKI Ltd., No. 02 CV 9297, 2004 WL 384885, at *4 (S.D.N.Y. Mar. 1, 2004) (quoting McGowan v. Smith, 52 N.Y.2d 268, 272 (N.Y. 1981)).  A foreign defendant need not enter New York to be subject to jurisdiction, "so long as [his] activities here were purposeful and there is a substantial relationship between the transaction and the claim asserted."  Chloe v. Queen Bee of Beverly Hills, LLC, 616 F.3d 158, 169 (2d Cir. 2010) (internal quotation marks and citation omitted).

The contacts alleged by Plaintiffs here do not amount to "purposeful availment" of the laws of New York.  None of the business activities allegedly conducted by the Foreign Defendants occurred in New York.  Plaintiffs do not allege that any contracts between any of the Foreign Defendants and Madoff or BLMIS were negotiated or executed in New York.  Instead,

_____

[5]     The Second Circuit has laid out several factors that should be considered in determining whether an out-of-state defendant transacts business in New York: "(i) whether the defendant has an on-going contractual relationship with a New York corporation; (ii) whether the contract was negotiated or executed in New York and whether, after executing a contract with a New York business, the defendant has visited New York for the purpose of meeting with parties to the contract regarding the relationship; (iii) what the choice-of-law clause is in any such contract; (iv) whether the contract requires franchisees to send notices and payments into the forum state or subjects them to supervision by the corporation in the forum state."  Maranga v. Vira, 386 F. Supp. 2d 299, 305-06 (S.D.N.Y. 2005) (quoting Agency Rent A Car Sys. v. Grand Rent A Car Corp., 98 F.3d 25, 29 (2d Cir. 1996)).

Plaintiffs have alleged that Foreign Defendants communicated with and transmitted information
and funds to and from BLMIS located in New York, in connection with their fund administration
and/or custodial duties under agreements negotiated with BLMIS.[6]   These communications and
payments were incidental consequences of fulfilling a foreign contract and are insufficient to
"project" the Foreign Defendants into New York.  See Roper, 2 F. Supp. at 474-75; see also
Beatie & Osborn LLP v. Patriot Sci. Corp., 431 F. Supp. 2d 367, 388 (S.D.N.Y. 2006) (no
personal jurisdiction when "the clear majority of the performance under the [contract] occurred"
outside of New York).  Plaintiffs also allege that HSBC Bank plc increased the flow of funds
into BLMIS by creating and marketing structured financial products and that it had hired KPMG
to conduct due diligence on BLMIS.  (Am. Compl. ¶¶ 25, 144, 147.)  Plaintiffs do not allege that
HSBC Bank plc conducted any of these activities in New York.  Any marketing, even if directed
at New York residents (which is not alleged here), is insufficient to establish a transaction of
business under Section 302(a)(1), unless it is supplemented by business transactions occurring in
the state.  See Maranga, 386 F. Supp. 2d at 308-09.[7]

---

[6]   Plaintiffs allege that HSBC Administrator Defendants "transmitted instructions" to
BLMIS in New York.  (Am. Compl. ¶ 20.)  It is clear, however, based on the Amended
Complaint that these instructions did not constitute to any relevant investment or
strategic instructions from the HSBC Administrator Defendants to BLMIS, since
Plaintiffs allege that Madoff had complete control over the accounts and was the only
person who purportedly purchased securities and other assets for the Plaintiffs' accounts
(id. ¶ 31), and Plaintiffs did not invest in the HSBC-administered feeder funds.

[7]   Moreover, Plaintiffs have failed to allege "some articulable nexus between the business
transacted and the cause of action sued upon" to satisfy the "arising from" requirement
under Section 302(a)(1).  See Ross, 2004 WL 384885, at *4.  Plaintiffs have not alleged
that any wrongful activity arose out of Foreign Defendants' contacts with New York.
The alleged wrongdoing by HSBC, which is located and conducts its business abroad, in
connection with ignoring red flags associated with Madoff and BLMIS activities is not
tied to any New York presence or activity.  Plaintiffs have not demonstrated how any of
HSBC's actions in New York were substantially related to the Madoff's Ponzi scheme or
caused Plaintiffs' alleged injuries.  See SPV OSUS LTD v. UBS AG, 114 F. Supp. 3d

Accordingly, the Court finds that Plaintiffs have failed to demonstrate that Foreign Defendants have transacted business sufficient under Section 302(a)(1) to confer personal jurisdiction over them in New York.  See In re Banco Santander Securities-Optimal Litig., 732 F. Supp. 2d 1305, 1320-22 (S.D. Fla. 2010) (finding that HSBC's contacts with New York in connection with their obligations as a Madoff "feeder fund" administrator and custodian were incidental to a foreign contractual relationship and do not meet the New York long-arm statute's transacting business requirement); cf. SPV OSUS, 114 F. Supp. 3d at 170 (finding, in connection with the operation of a similar foreign Madoff "feeder fund," that defendants' actions took place entirely abroad, with only sporadic or indirect contacts with the United States).

Alternatively, Plaintiffs contend that the HSBC Administrator and Custodian Defendants committed tortious acts sufficient to create specific jurisdiction under N.Y. C.P.L.R. section 302(a)(2).  Section 302(a)(2) extends specific jurisdiction to claims arising from the commission of a tortious act within the state.  The New York Court of Appeals has construed this provision to require that the defendant was physically present in New York when he committed the tort.  AVRA Surgical Robotics, Inc. v. Gombert, 41 F. Supp. 3d 350, 360 (S.D.N.Y. 2014) (citing Bensusan, 126 F.3d at 28).  Plaintiffs have not alleged that any of the Foreign Defendants have committed a tort while being physically present in New York. Plaintiffs argue, however, that where a foreign defendant: (1) receives a benefit from, and (ii) exercises control over, a New York agent, and that agent commits a tortious act in New York, the jurisdictional requirements of Section 302(a)(2) are satisfied.  (Pls. Opp. at 39.)  But to establish an agency relationship for jurisdictional purposes, Plaintiffs must show that the Foreign Defendants both received a benefit from, and exercised control over, Madoff or BLMIS.  See

101, 170-71 (S.D.N.Y. 2015).

<u>Grove Press, Inc. V. Angelton</u>, 649 F.2d 121, 122 (2d Cir. 1981).  Plaintiffs have alleged that "there was no independent oversight over BLMIS's activities," that BLMIS exclusively had control over investment decisions and that HSBC fully delegated its custodial responsibilities to BLMIS.  (<u>See</u> Am. Compl. ¶¶ 30-31, 58.)   Plaintiffs have made no non-conclusory allegations demonstrating that HSBC exercised control over Madoff or BLMIS in any way, and have failed to demonstrate the requisite agency relationship for asserting personal jurisdiction under Section 302(a)(2).  <u>Cf.</u> <u>We v. Merrill Lynch & Co, Inc.</u>, No. 99 CV 9687, 2000 WL 1159835, at *8-9 (S.D.N.Y. Aug. 15, 2000) (allegations that defendants "acquiesced" in, "encouraged," "recommended," and "ratified" the purported agent's actions insufficient to establish agency).

Plaintiffs have failed to demonstrate a basis for personal jurisdiction over the Foreign Defendants, and accordingly, the Court dismisses the Amended Complaint against the Foreign Defendants, which leaves HSBC USA, N.A., as the remaining Defendant.


II.        <u>SLUSA</u>

Defendants argue that SLUSA bars all of the claims in the Amended Complaint because the instant suit is a "covered class action" under the meaning of that statute.  SLUSA provides:

> No covered class action based upon the statutory or common law of any State or subdivision thereof may be maintained in any State or Federal court by any private party alleging –
>
> (A) a misrepresentation or omission of a material fact in connection with the purchase or sale of a covered security; or
> (B) that the defendant used or employed any manipulative or deceptive device or contrivance in connection with the purchase or sale of a covered security.

15 U.S.C. § 78bb(f) (LexisNexis 2008).[8]  A "covered security" is one traded nationally and listed

on a regulated national exchange.  Merrill Lynch, Pierce, Fenner & Smith Inc.v. Dabit, 547 U.S.

71, 83 (2006).  In Chadbourne & Parke LLP v. Troice, the Supreme Court held that investors who

purchased certificates of deposit from a bank that had misrepresented that it would invest the

underlying monies soundly had not identified misrepresentations and/or omissions "in

connection with" the purchase or sale of a covered security within the meaning of SLUSA

because the investors had no ownership interest in the securities purchased by the bank.  134 S.

Ct. 1058, 1066 (2014).  The Court reasoned that "every securities case in which this Court has

found a fraud to be 'in connection with' a purchase or sale of a security has involved victims

who took, who tried to take, who divested themselves of, who tried to divest themselves of, or

who maintained an ownership interest in financial instruments that fall within the relevant

statutory definition."  Id. (emphasis in original) (citing various cases).  Applying Chadbourne, the

Second Circuit held in In re Herald that SLUSA precluded the same types of claims that

Plaintiffs have alleged here against HSBC.  753 F.3d 110, 113 (2d Cir. 2014) (en banc).  In that

case, the plaintiffs alleged that JPMorgan and Bank of New York ("BNY") provided banking

services to Madoff despite red flags and knowing that they were substantially assisting fraud.

The Second Circuit distinguished the facts in Herald from those in Troice, explaining that:

> Madoff Securities, by contrast, fraudulently induced attempted investments in
> covered securities, albeit through feeder funds (not alleged in the instant
> complaints as anything other than intermediaries), and the defendant banks are
> alleged to have furthered that scheme.  Madoff Securities' victims thus 'tried to
> take . . . an ownership position in the statutorily relevant securities," i.e., covered
> securities.  That Madoff Securities (a Ponzi scheme) fraudulently failed to follow
> through on its promise to place the investments in covered securities does not in
> any respect remove this case from the ambit of SLUSA as defined in Troice.

---

[8]        See also 15 U.S.C. § 77p(b).

Id. at 113.  Likewise, in In re Kingate Mgmt. Ltd. Litig., the Second Circuit held that the

plaintiffs' claims were precluded by SLUSA where plaintiffs had "attempted investments in

covered securities, albeit through feeder funds."  784 F.3d 128, 142 (2d Cir. 2015) (citing

Herald, 753 F.3d at 113).  As in Herald, the Court found that the "in connection with" a purchase

or sale of a covered security element under SLUSA was satisfied because "by buying uncovered

shares in the offshore funds on the understanding that the funds would invest the proceeds in

S&P 100 stocks," the plaintiffs were "indirectly purchasing an interest in the covered S&P 100

securities."  Id.

          Plaintiffs claim that their discretionary accounts with themselves were not

covered securities.  (Pls. Opp. at 9.)  However, even more directly than in Herald and Kingate,

Plaintiffs held the BLMIS accounts with the understanding that BLMIS would invest that money

in covered securities.  The Amended Complaint specifically alleges that "Plaintiffs were willing

to maintain discretionary accounts with BLMIS and were induced to invest with Madoff for one

simple reason—they wished to receive the extraordinary returns that Madoff had become known

for by virtue of his investment expertise."  (Am. Compl. ¶ 31.)  Plaintiffs, accordingly,

"attempted investments in covered securities."  See Kingate, 784 F.3d at 142.  That Plaintiffs had

no control over which particular investment strategy Madoff undertook or specific securities he

purchased does not obviate the fact that Plaintiffs were "seeking, directly or indirectly, to

purchase covered securities," which the Second Circuit has squarely held satisfies the "in

connection with" the purchase or sale of a security requirement under SLUSA.  See Herald, 753

F.3d at 113; Kingate, 784 F.3d at 142.  Accordingly, Plaintiffs' claims are barred by SLUSA.

Plaintiffs, citing <u>Kingate</u>, also argue that SLUSA's "alleging" requirement is not met because Plaintiffs do not allege that HSBC made any misrepresentations or omissions to them, or engaged in deceptive conduct towards them, unlike the defendants in <u>Kingate</u> who apparently "expressly misrepresented to plaintiffs that they were investing in covered securities." (Pls. Opp. at 13-14.)  <u>Kingate</u> explained, however, that "if the success of a claim depends on conduct specified in SLUSA, and the defendant was complicit in that conduct, the claim is covered by SLUSA, even though plaintiffs have artfully avoided using SLUSA's terms."  784 F.3d at 149.   Indeed, <u>Kingate</u> explicitly held that the aiding and abetting claims against JP Morgan and BNY were precluded by SLUSA.  <u>See</u> 784 F.3d at 151; <u>see also</u> <u>In re Herald</u> <u>("Herald I")</u>, 730 F.3d 117, 119-20 (2d Cir. 2013) (finding that allegations that banks knew of fraud, failed to disclose fraud, and helped fraud succeed were "more than sufficient" to satisfy SLUSA).[9]  Likewise here, the Amended Complaint's theory of liability is that HSBC was complicit and/or assisted in perpetuating Madoff's fraud, and thus Plaintiffs' claims are precluded by SLUSA.  Because the Court finds that Plaintiffs' claims are barred by SLUSA, it will not consider the remainder of the parties' arguments.

<u>CONCLUSION</u>

The Defendants' motion to dismiss the Amended Complaint is granted.  The Clerk of Court is directed to enter judgment in favor of Defendants and close the case.

---

[9]     Plaintiffs' unjust enrichment claim is likewise precluded by SLUSA.  <u>See</u> <u>Herald I</u>, 730 F.3d at 119-20.

This Memorandum Opinion and Order resolves docket entry number 31.

SO ORDERED.

Dated: New York, New York
       September 15, 2016

_____/s/ Laura Taylor Swain_____
LAURA TAYLOR SWAIN
United States District Judge